**Karu Gene WHITE, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

Supreme Court of Kentucky.

Dec. 22, 1983.

As Modified on Denial of Rehearing
July 5, 1984.

Kevin Michael McNally, Asst. Public Advocate, J. Vincent Aprile II, Asst. Public Advocates, Dept. of Public Advocacy, Frankfort, for appellant.

Steven L. Beshear, Atty. Gen., K. Gail Leeco, Virgil W. Webb III, Asst. Attys. Gen., Frankfort, for appellee.

STEPHENSON, Justice.

Karu Gene White, his half-brother Thomas Bowling, and Charles Fisher were indicted for three counts of capital murder, three counts of first-degree robbery and one count of burglary. Fisher was fifteen years of age at the time of the commission of the crimes. Bowling was also a juvenile. White was an adult. Fisher was granted immunity and testified for the prosecution. Separate trials were ordered and White was tried first. A jury convicted White on all counts, and after the sentencing phase (KRS 532.025) the trial court in accordance with the recommendation of the jury imposed the death sentence for each of the three murders. Bowling was tried later and was sentenced to imprisonment for twenty years.

The victims, Charles and Lula Gross, ages seventy-five and seventy-four, and Sam Chaney, seventy-nine, lived together and operated a small store in rural Breathitt County. (The case was tried in Powell County.) There was an abundance of circumstantial evidence linking White to the murders. Fisher's testimony described in graphic detail the planning of the robbery by White and the gruesome account of the victims being beaten to death. The deputy coroner described the scene and conditions of the bodies. He testified that due to the extent of the injuries the victims were buried in disaster pouches.

During the course of the voir dire, White changed his defense to not guilty by reason of insanity or intoxication. He testified in his own behalf. During the course of his testimony, he stated that he took drugs, LSD being his favorite. On the day of the killings, he took LSD, he and Bowling met Fisher and he procured a tire tool from a parked truck to knock out the victims. (Fisher had testified that he had a wrench and that on the way to the store a tree limb was procured for Bowling.) White testified that he went into the store and saw the victims lying on the floor. He further testified that he did not hit anyone and did not mean to hurt anyone. He said when he forced open the side door of the store, he lost his memory. He denied hitting the victims, but said he must have.

Members of the family testified as to his mental problems, violent nature and bizarre habits.

The principal assertions of error made by White are conflict of interest on the part of his counsel and assertions relating to jury selection encompassing some ten separate points of error.

It appears that defense counsel Charters was employed by Fisher and defense counsel Early by White and Bowling.

The incident which precipitated the conflict of interest argument occurred on the fourth day of voir dire of the prospective jurors when Fisher agreed to testify for the prosecution in exchange for immunity. As soon as he learned of the prospective agreement, Charters notified the trial court and withdrew as counsel for Fisher. Other counsel was then appointed to represent Fisher. The voir dire and trial then proceeded with Charters and Early representing White. During the course of the trial, Fisher was cross-examined by Charters.

White first urges that we adopt a rule that joint representation constitutes a per se violation of the constitutional guarantee of effective assistance of counsel. We are cited to Fleming v. State, 246 Ga. 90, 270 S.E.2d 185 (1980), as authority for this proposition.

We reject this argument. Our reasons are twofold. First the United States Supreme Court in *Holloway v. Arkansas*, 435 U.S. 475, 482–483, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426, 433 (1978), stated:

"One principle applicable here emerges from *Glasser* without ambiguity. Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not per se violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation. In Mr. Justice Frankfurter's view: 'Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack.' *Glasser v. United States*, supra, [315 U.S. 60], at 92, 62 S.Ct. 457, [at 475], 86 L.Ed. 680 (dissenting).[5]

\*　\*　\*　\*　\*　\*

5. [3b] By inquiring in *Glasser* whether there had been a waiver, the Court also confirmed that a defendant may waive his right to the assistance of attorney unhindered by a conflict of interests."

Secondly we have adopted RCr 8.30, which requires separate counsel except when waived by the defendant. In compliance with RCr 8.30 the trial court explained the possibility of conflict of interest to Fisher, White and Bowling. The colloquy engaged in by the trial court in determining that each of the defendants was making an informed and intelligent waiver consumed twenty-five pages of transcript. At the conclusion, all three signed a waiver in conformity with RCr 8.30.

Potential conflict if all three defendants were tried together was raised by the prosecution and resulted in the trial court's ordering separate trials. One such conflict appeared to be the argument that juveniles should be treated differently in death penalty cases.

We are of the opinion from our review of the record that White made an informed and intelligent waiver of separate represen-

tation. In considering this, we are of the further opinion that in this respect a death penalty case should not be treated any differently than any other criminal case. As observed in *Holloway*, in some cases certain advantages might accrue from joint representation.

We are of the further opinion that in the circumstances presented here there was no demonstrated conflict of interest. White argues that earlier Charters engaged in plea bargaining on behalf of Fisher. We do not see it that way. What is called plea bargaining was some months before trial an offer of immunity transmitted to Fisher through his lawyer. This offer was rejected and by no means could be characterized as plea bargaining. Fisher's lawyer had a duty to convey the offer as there could be no contact initiated by the prosecution save through Fisher's lawyer. White takes the position that throughout both Charters and Early jointly represented all three defendants.

According to White's lawyer, the *voir dire* of the jury had been based on a circumstantial case/alibi defense. Counsel informed the court after Fisher accepted the offer of immunity that any potential conflict was resolved with the absence of Fisher as a defendant. The trial court was also informed by counsel that until Fisher had accepted the offer of immunity, their clients had all insisted they did not commit the crimes.

Charters and Early thereafter informed the trial court that White's defense was now changed to "not guilty by reason of insanity, intoxication."

This change of plea led to several of the assertions of error on *voir dire* which will be discussed later.

Counsel urged the trial court to continue the case since the defense had completely changed. The trial court denied this motion, but did recess for six days to permit psychological and psychiatric review.

Out of an abundance of caution, we have examined the record to determine if in fact there was an actual conflict of interest

adversely affecting the performance of White's counsel. We are of the opinion, and so hold, that White has not established from the record that an actual conflict of interest adversely affected his lawyer's performance.

■ Here we do not have the classic conflict of interest scenario where defendants are tried together. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), addressed issues left unresolved in *Holloway*, supra. The first issue is that the trial judge is not required to inquire into the propriety of multiple representation where there has been no objection, and the trial courts may assume no conflict or that the lawyer and his clients knowingly accept such risk of conflict. This issue is resolved by RCr 8.30 and the waiver signed by White. Next the *Cuyler* court held that in such event mere possibility of conflict was not enough that an actual conflict of interest adversely affecting his lawyer's performance must be established.

As to Fisher, White made much of Fisher's appointed counsel's invoking the client/attorney privilege. In the first place, whether or not Charters remained in the trial this privilege applied. Next, Fisher was granted immunity, he can no longer be in jeopardy, he had no possible interest to advocate or to protect. Finally, on the overriding concerns in the conflict of interest situations is the possibility that the lawyer representing multiple clients might use confidential information to the detriment of one of the other clients. As to this possibility applied to Fisher, the change of defense to not guilty by reason of insanity made it highly unlikely that Charters had any such information to use even had he desired to do so. There is nothing in the record to suggest that there was any such information. After all, Fisher together with White had told their lawyers they did not commit the crimes.

Charters informed the jury during opening statement that Fisher had agreed to testify for the prosecution in exchange for immunity. Fisher was the principal witness for the prosecution, he detailed the gruesome nature of the crime and was vigorously cross-examined by Charters as to White's habits with various drugs, bizarre behavior, etc. This cross-examination and the cross-examination of other witnesses attempted to establish that the crimes showed they had been committed by a "berserk" individual.

The arguments of conflict of interest with respect to Bowling reveal trial tactics designed to show bizarre behavior on the part of White.

Charters and Early withdrew as counsel for Bowling, and Bowling was represented by other counsel in his trial. The argument that Charters and Early should have explored a defense that White was not involved is not realistic. The circumstantial evidence was strong and with Fisher testifying for the prosecution, the evidence that White committed the crimes was overwhelming.

■ We have decided the conflict of interest question on the record even though a conflict of interest constitutes ineffective assistance of counsel. *Holloway* and *Cuyler*, supra. We regard the conflict question as being outside the rule in *Cleaver v. Commonwealth*, Ky., 569 S.W.2d 166 (1978), which requires that the issue of ineffective assistance of counsel be first determined by the trial court.

The change of theory of the defense precipitated another spate of arguments, White moved for a mistrial, the right to exercise peremptory challenges on the eleven jurors accepted prior to the change of defense to not guilty by reason of insanity. The trial court did permit further *voir dire* of those jurors already accepted on the insanity defense and entertained motions to strike for cause on these jurors. White also made a request for additional peremptory challenges. The trial court had already granted four additional peremptories over and above the eight mandated by RCr 9.40, and there was no abuse of discretion in declining to grant additional peremptories.

■ We are of the opinion the trial court properly denied all of these motions. White argues that the change of defense necessitated either a mistrial or peremptories on those jurors already seated for the reason they had been qualified for an alibi defense. White misses the point. These eleven jurors had been qualified to try the case on the evidence before them, free of prejudice or bias. This is all White was entitled to, no more.

The trial court properly allowed additional *voir dire* on the insanity defense to see if any of the jurors should be excused for cause. In questions to the jurors, the trial court asked if the jurors believed from the evidence that White was insane would they be willing to "turn him loose"? White states that numerous objections were made to these questions, but a search of the record does not reveal any objections. Why should there be? This line of questioning did not appear to disturb any of the participants. This expression is clearly, from a reading of the entire *voir dire*, a colloquialism for "not guilty." The jurors all answered that they would be willing to do so. White was receiving as much or more than he was entitled to in this respect. At one point White's lawyer requested the trial court to use another phrase, and the Commonwealth's attorney requested the trial judge to define the term for the jury. All in all, we cannot see that White has any complaint in this respect. White's argument to the contrary, all of the jurors stated they could follow the law on the insanity defense. There is no error.

■ A number of arguments are made by White on the application of the test in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We have examined all those instances and are of the opinion the trial court acted properly in each instance. All those jurors excused for cause had indicated an irrevocable commitment against the death penalty regardless of any facts or circumstances which might emerge at the trial. The *Witherspoon* test is pretty straight forward, but sometimes not readily understood by laymen and fre-

quently requires additional questioning. We observe that qualifying jurors under *Witherspoon* is not helped along by defense counsel asking if the juror could vote for the death penalty if Hitler were on trial, if the Iranian hostages had been killed and their killers were on trial, or a more outrageous question, if the murderer of a member of the juror's immediate family were on trial. Attempts to elicit a response that a juror could vote for the death penalty in hypothetical situations such as these is not in conformity with *Witherspoon* and is not permissible.

■ White argues that he did not have sufficient time to procure expert testimony to bolster his defense of insanity. The trial court recessed for almost a week to permit psychiatric tests and examination. White called neither the psychiatrists nor the psychologist, who conducted the tests, nor did he make a showing as to what they would testify. The inescapable conclusion is that in this respect the testimony would not have been favorable to White. There were many witnesses who testified as to White's bizarre behavior which led them to the conclusion that he was insane or unstable. Dr. Drew, the psychopharmacologist White intended to call, could not appear because of illness. No attempt was made to take his deposition or to subpoena him. White's counsel stated that he would have testified extensively about the effects psychologically and physiologically on any individual who made extensive use of drugs.

We are of the opinion there was no error in the trial court's refusal to grant a further continuance in the first instance or grant a continuance for the reason Dr. Drew could not attend the trial. White testified extensively about himself, including the use of drugs and alcohol.

White urges us to grant a new trial for the reason the trial was conducted in a way that inflamed the jury with emotional outbursts by the daughter of the victims. After an examination of the record, we observe that if the jury was inflamed at all it was by the barbaric nature of the crimes. It would be rare indeed to assemble a

group of laymen on a jury that could maintain a clinical detachment after the portrayal of the bestial manner in which the victims were murdered.

A review of the entire record convinces us that no reversible error was committed during the guilt or innocence phase of the trial.

We now reach the penalty phase of the trial. No evidence was presented by either side, and after argument the jury retired and after deliberation returned verdicts of death on each of the three counts of murder.

White argues that the evidence shows the killings were not intentional and argues insufficient proof that White actually killed or attempted to kill. White is attempting to draw a parallel between the facts of this case and *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). There is a vast difference. *Enmund* was not present when the victims were killed, he was in the getaway car. The jury here found that White intentionally killed all three victims. There was sufficient evidence upon which to base the finding, and *Enmund* simply does not apply.

White makes a number of arguments as to the instructions and that all mitigating circumstances were not considered by the jury or presented to the jury. There were no objections to the instructions. The apparent reason is that the instructions on mitigating circumstances were all inclusive, contrary to White's assertions. The jury was instructed:

### "MITIGATING CIRCUMSTANCES

In recommending a sentence for the defendant for the murder of [victim's name], you shall consider such mitigating or extenuating circumstances as have been presented to you in the evidence, *including but not limited* to such of the following as you may believe from the evidence exists:

1. That the defendant has no significant history of prior criminal activity.

2. That when he committed the offense of which you have found him guilty he was acting under the influence of extreme mental or emotional disturbance, even though the influence of extreme mental or emotional disturbance was not sufficient to constitute a defense to the crime.

3. That at the time of the capital offense the capacity of the defendant to appreciate the criminality of his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication even though the impairment of the capacity of the defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of law was insufficient to constitute a defense to the crime.

4. The youth of the defendant at the time of the crime.

In addition to the foregoing, you shall consider also those *aspects of the defendant's character and record,* and those *facts and circumstance of the particular offense* of which you have found him guilty, *about which he has offered evidence in mitigation* of the penalty to be imposed upon him and which you believe from the evidence to be true." [Emphases added.]

This instruction permits the jury to consider every circumstance in mitigation offered by White. We find no error in this respect.

Further the record refutes White's argument that the trial judge sentenced him to death without considering relevant mitigating evidence concerning White's childhood and upbringing. The trial court in imposing the sentence stated:

"[T]he Court having considered all the evidence in this case and the circumstances of the case and the arguments of counsel and the mitigation of circumstances, the Court can find nothing in the record to justify a reduction of the sentence as recommended by the jury. The Court feels that if there ever was a case where the death penalty is justified, this is it. No cause being shown as to why

judgment should not be pronounced, it is ordered and adjudged by the Court that the defendant, Karu Gene White, is hereby sentenced to death by electrocution or such other means of execution as may be provided by law."

The trial judge is entitled to give "great weight" to the recommendation of the jury. *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980).

 As for the argument that imposition of the death penalty is cruel and unusual punishment and as such violated both the Constitution of the United States and the Constitution of Kentucky, we say again capital punishment is a prerogative of the legislature, not the judiciary. We have reviewed the additional assignments of error—approximately 34 in number—made by the appellant herein, and find them without merit.

■ We have conducted our review of the death sentence in accordance with the provisions of KRS 532.075. We are of the opinion from the record that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor and that the evidence supports the finding of an aggravating circumstance. KRS 532.025(2)(a).

We have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases and have in this regard considered the crimes committed here and all of the evidence surrounding White and his background.

The data for our use in this regard have been compiled in accordance with KRS 532.075(6)(a), (b) and (c). We have considered all of the cases in which the death penalty was imposed after January 1, 1970, as follows: *Scott v. Commonwealth,* Ky., 495 S.W.2d 800 (1972); *Leigh v. Commonwealth,* Ky., 481 S.W.2d 75 (1972); *Lenston and Scott v. Commonwealth,* Ky., 497 S.W.2d 561 (1973); *Call v. Commonwealth,* Ky., 482 S.W.2d 770 (1972); *Caldwell v. Commonwealth,* Ky., 503 S.W.2d 485 (1972); *Tinsley and Tinsley v. Commonwealth,* Ky., 495 S.W.2d 776 (1973); *Galbreath v. Commonwealth,* Ky., 492 S.W.2d 882 (1973); *Caine and McIntosh v. Commonwealth,* Ky., 491 S.W.2d 824 (1973); *Hudson v. Commonwealth,* Ky., 597 S.W.2d 610 (1980); *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511 (1977); *Self v. Commonwealth,* Ky., 550 S.W.2d 509 (1977); *Boyd v. Commonwealth,* Ky., 550 S.W.2d 507 (1980); *Smith v. Commonwealth,* Ky., 599 S.W.2d 900 (1980); and *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980).

All of these cases except *Gall* have had the death penalty set aside for the reason the statute was invalid under *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In making a comparative study of these cases and the circumstances in this case, we are of the opinion the sentence of death here is not excessive or disproportionate to the penalty imposed in the enumerated cases.

The judgment is affirmed.

All concur.