Edward Lee HARPER, Jr., Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

Supreme Court of Kentucky.

May 2, 1985.

Rehearing Denied Sept. 5, 1985.

Michael A. Wright, Asst. Public Advo-cate, JoAnne M. Yanish, Asst. Public Advo-cate, Frankfort, for appellant.

David L. Armstrong, Atty. Gen., David W. Mossbrook, Asst. Atty. Gen., Frankfort, for appellee.

STEPHENSON, Justice.

Edward Lee Harper, Jr., 33 years of age, was charged with two counts of capital murder, KRS 507.020, and found guilty of both by a jury. At the penalty phase of the trial, the jury recommended the death penalty on each count, and Harper was then sentenced to death. KRS 532.025 and KRS 532.030. Harper appeals the sentence to this court. We affirm.

A summary of the evidence introduced at trial shows that about a month before the murders Harper had asked a girl friend if she would have her brother procure an untraceable and unregistered gun for him. Nothing came of this request. Later, Har-per asked an acquaintance to purchase a .38 special or a .357, without serial num-bers. Harper called several times inquir-ing about progress in procuring the gun and then, two days before the murders, advised that he was getting the gun from someone else.

On the same day, Harper called a Vernon Priddy who had advertised that he had a .38 special for sale. Harper told Priddy

that he wanted to buy the gun for his wife and that his name was Johnson. Harper met with Priddy at about 6 p.m. on the day of the murders and purchased the gun and six bullets. Earlier that day, Harper had purchased some .38 special bullets from a hardware store. After the purchase from Priddy, he returned the bullets purchased from the hardware store and insisted that his name be removed from the log book.

Harper then went to a park where he loaded the gun and test fired it. After watching his son play ball for a while, Harper then went to a bar. He left the bar about 11 p.m., went home, and shot and killed both of his parents. He then attempted to make it appear as if a burglary had occurred by throwing articles of clothing around and removing some items from the house. He threw the gun into a lake and disposed of other items in a ditch and the river. After this, he went home and called the police.

When asked by the police, Harper told them his father kept a .38 special in a bedroom closet. This was false. He added that he had purchased bullets at a hardware store and then returned them because they were not the type his father wanted. The police later found some of the items disposed of by Harper. The individual from whom Harper had wanted to purchase a .38 special or .357 notified the police of this fact. When Harper set up an appointment with this individual, the police put a tape recorder on him and taped the conversation with Harper. Nothing incriminating was on the tape.

While tracing guns sold through a publication, Bargain Mart, the police contacted Vernon Priddy who described the person who purchased the gun from him. This description fit Harper, and subsequently at a lineup, Priddy identified Harper as the purchaser. Harper was then advised of his constitutional rights and was placed under arrest for two counts of murder. At first, he maintained he was not involved and had not purchased a gun. A few minutes later, he said he would make a statement and did so. He confessed to purchasing the gun and killing his parents. He also showed the police where he had disposed of the gun, which was recovered by divers.

Harper relied upon a defense of insanity. He testified in his own defense. His testimony was that his mother was becoming increasingly violent towards his father, that his father was depressed, and asked Harper to kill him. After repeated requests by his father, Harper testified, he decided to kill him. He then told the jury how he purchased the gun and how he killed his father and mother.

Harper testified he did not want to do it, but kept hearing his father's voice telling him to do it. He testified he went to his parents' room, that his father pointed to his mother, and yelled that he should shoot her. He then screamed for Harper to shoot him.

A psychologist called by Harper diagnosed him as having a schizophrenic form disorder and that he would not have full faculty of knowing right from wrong when suffering from an episode of the disorder. He also testified that Harper would not be able to control his action because of the belief he was under his father's control. A psychiatrist also confirmed the diagnosis of the psychologist.

Various lay witnesses for the Commonwealth testified that Harper was normal in all respects before and after the night of the murders and during subsequent interviews.

The jury found Harper guilty. After the penalty phase of the trial, the trial court submitted six mitigating and two aggravating factors to the jury. The jury recommended a death sentence on each murder, and the trial court accepted each recommendation in sentencing Harper to death.

■ Harper has several assertions of error on the voir dire. He argues that four of the prospective jurors should have been excused for expressing a reservation about the defense of insanity. After the expressions of doubt, each juror was questioned and in each instance stated an ability to follow the law on an insanity defense. Cu-

riously, two of these jurors were excused by the Commonwealth. No error was committed here.

■ For some reason, Harper complains that the trial court should have excused a juror reluctant to impose the minimum sentence. As this juror was excused by the Commonwealth, it is impossible to see how Harper was prejudiced. Two jurors were excused for cause, as they were unmistakably opposed to the death penalty. Harper argues this is error. We have reviewed the evidence and are of the opinion both were properly excluded in accordance with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); and also *Wainwright v. Witt*, — U.S. —, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), which held in a death penalty case a prospective juror could be excluded for views which would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.

■ Harper wrote a letter to the trial court confessing to the murders. This letter was made part of the record and sealed. It was not used at trial. The argument that the trial court should have recused himself as a consequence of this is totally meritless.

■ A pretrial motion to suppress any oral or written statements made by Harper was filed. The basis of the motion was that they were made under duress without a knowing and voluntary waiver of right to counsel and to remain silent. A suppression hearing was held, and at the conclusion the trial court ruled the statements admissible. This ruling was not challenged on the motion and grounds for new trial filed by Harper. In his brief, he complains about the trial court not making findings of fact required by RCr 9.78. The Commonwealth's brief on this point acknowledged that a portion of the tape of the suppression hearing could not be found and transcribed. This is when Harper leaped into the fray on this point and claimed, by supplemental brief, that he had unlawfully been questioned by the police after he had requested counsel. Harper misses the point. If he is displeased by the ruling of the trial court, it is up to him to show that the ruling of the trial court is clearly erroneous. In order for us to have a complete review of this assertion, it was incumbent upon Harper to supply the transcript of the hearing. Our rules make provision for situations such as this where a portion of the tape is lost. CR 75.13 provides for a narrative statement if the proceedings at the hearing cannot be transcribed. We see no reason why this procedure could not have been followed here. In its present posture, we have the statement read at trial. The statement begins with the *Miranda* warning and Harper saying he understood. Then after a detailed confession by Harper, he asks to talk with his attorney. There were other questions by the police going over the same matters contained in the confession. The trial court did not permit any of the questions and answers to be heard by the jury after the request to see his lawyer.

■ The partial transcript of the suppression hearing contains the testimony of one of the police officers who interrogated Harper and Harper's testimony. In this portion, Harper testified that he requested an attorney before he made the statement in addition to the request made at the conclusion of the statement while being questioned. The police officer testified that he advised Harper he could stop the questions at any time, but that Harper said he wished to go on. RCr 9.78 provides that the ruling of the trial court is conclusive if supported by substantial evidence. *Hamilton v. Commonwealth*, Ky., 580 S.W.2d 208 (1979). Harper has made no effort to demonstrate that the ruling is clearly erroneous. In the absence of any showing to the contrary, we assume the correctness of the ruling by the trial court.

■ The provisions of CR 75.13 provide a complete vehicle for an appellant to remedy the lack of part of a hearing if he feels that this would be helpful to his cause. CR 75.13 provides:

(1) In the event no mechanical or stenographic record of the evidence or proceedings at a hearing or trial was taken or made or, if so, cannot be transcribed or are not clearly understandable from the tape or recording, the appellant may prepare a narrative statement thereof from the best available means, including his recollection, for use instead of a transcript or for use as a supplement to or in lieu of an insufficient mechanical recording. This statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service upon him. Thereupon the statement, with the objections or proposed amendments, shall be submitted to the trial court for settlement and approval, and as settled and approved shall be included in the record on appeal.

(2) By agreement of the parties a narrative statement of all or any part of the evidence or other proceedings at a hearing or trial may be substituted for or used in lieu of a stenographic transcript or mechanical recording.

CR 75.14 makes further provisions to cover difficulties in preparing a narrative statement. We cannot think of any reason why the record could not have been supplemented here. Further, this record can be supplemented at any time if Harper is able to make a showing that the trial court is clearly erroneous. In the absence of such a showing, we can only conclude the ruling of the trial court was proper.

■ Further, we are of the opinion that all of the circumstances bolster the ruling of the trial court. Harper clearly was given his *Miranda* rights at least twice before making a statement.

Without any initiative on the part of the police officers, he volunteered to take them to the location where he disposed of the gun. He called his lawyer and, in the presence of the police officers, told his lawyer he had killed his parents. After returning from showing where he had thrown the gun, Harper telephoned an uncle and also the mother of his ex-wife. He told both of them he had killed his parents. All of this was in the presence of the police. Harper was determined to tell anybody who cared to listen that he had committed the murders. From the testimony of the police officer at the trial and Harper's testimony at trial, he volunteered the confession. He told the police, "Sit down, I want to tell you all about it." At trial, again and again, he testified he wanted to tell the police and others about the killings. From the letter to the trial court, which could have been used at a trial conducted by another judge, to his testimony at trial, he admitted the murders. His defense was insanity.

■ This leads us to Harper's argument that he was entitled to a directed verdict of not guilty by reason of insanity. Harper testified that his father had told him repeatedly to do the killings. His statement to the police was that his father controlled his mind. However, he seemed to remember everything in over one-hundred pages of testimony. He bases this assertion on the fact that a psychologist and a psychiatrist testified for him on this issue and only lay witnesses for the Commonwealth. *Wiseman v. Commonwealth*, Ky., 587 S.W.2d 235 (1979), stands for the proposition that this situation presents a question for the jury. Additionally, we have read the testimony of the defense witnesses, and at best their testimony is equivocal on this subject. Neither testified that in his opinion Harper, at the time of the killing, probably lacked substantial capacity to appreciate the criminal nature of the act and that he did not have substantial capacity to conform his conduct to the requirements of law. This is the test incorporated into the instructions given to the jury. In any event, the trial court did not err in denying the motion for a directed verdict.

Harper asserts error in the trial court's permitting the jurors to take notes and that the photographs introduced by the Commonwealth were inflammatory.

■ The trial court allowed jurors to take notes for their own use but advised

the jury that the notes could not be used to influence other jurors and did not permit the jurors to take the notes into the jury room. We are of the opinion this procedure by the trial judge was proper.

■ As to the photographs, Harper informed the trial court that there was no fact in issue which the photographs would prove and urged the trial court to prohibit introduction of the photographs because of their gruesome nature. The photographs showed the scene of the crime, the wounds to the bodies, etc. *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980), approved the introduction of similar photographs. We are of the opinion photographs such as these are pertinent to the jury in considering the case. We agree that such photographs are gruesome, but that is a consequence of the crime. We cannot expect a jury composed of laymen to observe and hear the details of heinous crimes in clinical detachment. Harper was not entitled to have the photographs excluded. The use of the photographs did not unfairly prejudice Harper.

■ Harper asserts that the Commonwealth's attorney improperly referred to the jury as "recommending" the death penalty. Of course, the jury does recommend the death penalty. The instructions of the trial court refer to recommendation many times. The point Harper is attempting to make is that it is improper to impress on the jury it has no responsibility in imposing the death penalty or attempting to diminish the responsibility of the jury in this respect. We have examined the record and are of the opinion the use of "recommend" by the Commonwealth's attorney here was not of such a character as to lead the jury to believe its responsibility was diminished. We note that Harper complains of the final argument by the Commonwealth but does not call our attention to his argument that "it's your penalty," "your voice alone is the executioner of this community," "it takes twelve of you to pull that switch," "you're pulling the switch," etc.

We are of the opinion there must be a look at the entire scenario in deciding this question. We have examined the voir dire, the remarks of the Commonwealth, and the defense and are of the opinion the jury was fully aware of its responsibility in recommending a sentence of death and that none of the remarks tended to denigrate the function of the jury in imposing the death penalty.

The trial court submitted to the jury "murder for profit," together with multiple murder, as aggravating circumstances, KRS 532.025(2)(a) 4, which provides under "Aggravating Circumstances" as follows: "The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit." The jury found both multiple murder and murder for profit as aggravating circumstances.

■ Harper argues that the Commonwealth did not prove "murder for profit" sufficiently to submit the circumstance to the jury, for the reason there is no direct proof of such intent. The victims left a substantial estate. Harper is an only child. He was unemployed at the time, and immediately after the murders, he sold some furniture from his parents' house. We are of the opinion the jury could reasonably infer from the circumstances here that Harper was motivated by profit to commit the murders. The jury could reasonably infer that Harper knew the estate would be substantial and that he would inherit. In any event, multiple murder in itself would satisfy the requirements of the statute.

■ Shortly before the end of the penalty phase, Harper's lawyer moved to have Harper declared incompetent to assist in his own defense. This motion was properly overruled by the trial court. There was no showing that Harper's actions in court or during his testimony on both phases of the trial were of such a nature as to alert the trial court to the need for further mental examination.

■ For some reason, obscure to us, the Public Advocate keeps insisting on ac-

cess to the data collected by this court under the provisions of KRS 532.075(6). We had thought that *Ex Parte Farley*, Ky., 570 S.W.2d 617 (1978), settled this question. There is no articulated reason why the Public Advocate cannot assemble this data for use in capital cases. Here, Harper's indigency is cited. The Public Advocate has the curious idea that we consider all previous cases which were tried or could have been tried as capital cases. This is a mistaken belief. KRS 532.075(6) refers to records of all felony offenses in which the *death penalty was imposed* after January 1, 1970, or such earlier date as the court may deem appropriate. We have used such cases commencing in 1972. The Public Advocate can study these cases, as we have done. We state in our opinions all matters considered by us, and in no way are mysterious and secret records or data taken into account in our deliberations. The time and effort expended in arguing this point would suffice to compile all the data we consider.

We have examined the arguments made by the Commonwealth and do not consider such arguments unfairly prejudicial. Matters not commented upon in this opinion are considered meritless.

■ We have conducted our review of the death sentence in accordance with the provisions of KRS 532.075. We are of the opinion from the record that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that the evidence supports the finding of an aggravating circumstance. KRS 532.025(2)(a).

We have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases and have in this regard considered the crimes committed here and all of the evidence surrounding Harper and his background.

The data for our use in this regard have been compiled in accordance with KRS 532.075(6)(a), (b) and (c). We have considered all of the cases in which the death penalty was imposed after January 1, 1970,

as follows: *Scott v. Commonwealth*, Ky., 495 S.W.2d 800 (1972); *Leigh v. Commonwealth*, Ky., 481 S.W.2d 75 (1972); *Lenston and Scott v. Commonwealth*, Ky., 497 S.W.2d 561 (1973); *Call v. Commonwealth*, Ky., 482 S.W.2d 770 (1972); *Caldwell v. Commonwealth*, Ky., 503 S.W.2d 485 (1972); *Tinsley and Tinsley v. Commonwealth*, Ky., 495 S.W.2d 776 (1973); *Galbreath v. Commonwealth*, Ky., 492 S.W.2d 882 (1973); *Caine and McIntosh v. Commonwealth*, Ky., 491 S.W.2d 824 (1973); *Hudson v. Commonwealth*, Ky., 597 S.W.2d 610 (1980); *Meadows v. Commonwealth*, Ky., 550 S.W.2d 511 (1977); *Self v. Commonwealth*, Ky., 550 S.W.2d 509 (1977); *Boyd v. Commonwealth*, Ky., 550 S.W.2d 507 (1977); *Smith v. Commonwealth*, Ky., 599 S.W.2d 900 (1980); *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980); *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519 (1984); and *White v. Commonwealth*, Ky., 671 S.W.2d 241 (1984).

■ All of these cases except *Gall*, *McQueen*, and *White* have had the death penalty set aside for the reason the statute was invalid under *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In making a comparative study of these cases and the circumstances in this case, we are of the opinion the sentence of death here is not excessive or disproportionate to the penalty imposed in the enumerated cases.

The judgment is affirmed.

All concur.

LEIBSON, J., files a separate concurring opinion.

LEIBSON, Justice concurring.

I am not in agreement with so much of the majority opinion that seems to require that the appellant must provide a complete narrative statement of the pretrial hearing of his Motion to Suppress his confession before he can complain that the trial court erred in failing to suppress the confession.

It appears from the record that the suppression hearing was not stenographically

reported, but was only recorded on audio tape, and that a portion of that tape has been misplaced. The appellant relies on the remaining portion of that tape in claiming that the ruling of the trial judge admitting his confession was erroneous. That portion of the tape which remains includes his testimony to the effect that he asked to see his lawyer before he was questioned, and was told that he "wouldn't need an attorney(;) that all they (attorneys) would do is take my money."

At the pretrial hearing the burden is on the Commonwealth to show the confession was properly obtained by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Under ordinary circumstances, if the only evidence in the record, albeit incomplete, is to the effect that the confession was not properly obtained, I see no duty on the appellant to provide a narrative statement supplementing such record. All he could add is what he claims was *not* said. However, in this case there are compelling circumstances indicating that the trial court did not err.

First, we have the trial testimony of both police officers who were present, indicating that the initial questioning was routine and, by implication, that appellant did not ask to see an attorney before the questioning began.

Next, the transcript of the suppression hearing was filed on September 27, 1982, the trial commenced on October 5, 1982, and twenty-one months later on January 30, 1984, the Brief for Appellant was filed. It is inconceivable that this Brief for Appellant would not have claimed error in failing to suppress this confession on this grounds if there was any substance to the claim that the Commonwealth had failed to make out a prima facie case for admission of the confession at the suppression hearing.

The point is first raised in the Supplemental Brief for Appellant filed November 12, 1984. Patently the appellant has belatedly discovered that a portion of the tape of the suppression hearing has been mis-

placed and seized on this to raise a point previously nonexistent.

Under ordinary circumstances, where such testimony as has been provided indicates the trial court's ruling was erroneous, I would not impose upon a defendant the burden to provide a complete transcript of a suppression hearing before claiming error in failure to suppress. However, I agree with the result in the present case because I am convinced the claimed error did not occur.