**James H. BARNETT, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2008–SC–000615–MR.

Supreme Court of Kentucky.

May 20, 2010.

Rehearing Denied Aug. 26, 2010.

---

Kathleen Kallaher Schmidt, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Jason Bradley Moore, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCHRODER.

Appellant James Barnett appeals as a matter of right from a judgment convicting him of wanton murder and theft. Finding no reversible error, we affirm Appellant's conviction. We also clarify that under our criminal rules, jurors must be permitted to use their notes during deliberations.

## BACKGROUND

On the morning of June 13, 2007, Jamie Townsend saw Appellant driving erratically at a high rate of speed in Clay City, Kentucky. Appellant squealed his tires and pulled into a parking lot where Townsend's daughter was riding her bicycle. Witnesses saw Appellant drinking something from a bottle. Appellant later admitted to using Xanax, cocaine, and possibly Percocet and methadone that morning.

After witnessing Appellant's erratic driving, Townsend called 911, and Clay City Police Chief Randy Lacy responded. Chief Lacy arrested Appellant on suspicion of DUI, handcuffing him with his arms in front of his body. Witnesses testified that Appellant and Chief Lacy knew each other, and that Appellant was cooperative. Chief Lacy placed Appellant in the back of his police cruiser, and then went to speak to Townsend and take photographs of the tire marks Appellant left in the parking lot. At some point while Appellant was alone in the police cruiser, he reached through an open partition and took a handgun from the front seat.

While Chief Lacy was driving Appellant to the Powell County Jail in Stanton, Appellant fired a shot from Chief Lacy's gun. The bullet passed through the partition and struck Chief Lacy in the head, killing him. The cruiser went out of control and wrecked. Appellant kicked out the back window of the cruiser, but was stopped by witnesses as he left the scene.

Appellant did not deny the underlying facts; his defense was based on intoxication and mental health issues. The Commonwealth sought the death penalty based on the aggravating circumstance of Chief Lacy being a police officer. Due to pretrial publicity and the fact that Chief Lacy was a well-known and respected member of the community, the Powell Cir-

cuit Court granted a change of venue to Montgomery County.

After a jury trial, Appellant was found guilty of wanton murder and theft. The jury found Appellant not guilty of escape and intentional murder. After his conviction, Appellant agreed to a sentence of life imprisonment without the possibility of parole for 20 years, to run concurrently with a sentence of 3 years' imprisonment for the theft. He appeals to this Court as a matter of right,[1] and raises a number of issues related to his trial.

## ANALYSIS

### I. The Jurors Were Properly Permitted To Use Their Notes, And The Trial Court Did Not Abuse Its Discretion Regarding Review of Trial Testimony

 Appellant argues that the trial court erred in allowing the jurors to use their notes in deliberations, and in not allowing jurors to review trial testimony. When the jury retired to begin deliberations, the trial court informed the jurors that they would not be permitted to take their notes with them to the jury room. After approximately four hours, the jury returned and the foreperson requested that the jury be allowed to review the first day of trial testimony. The jury had a number of specific, factual questions, and according to the foreperson, different jurors had different questions. The foreperson also stated, "Our notes would help us out a lot."

During a bench conference, both the Commonwealth and defense counsel objected to the jurors being permitted to take their notes into the jury room. Both parties suggested that the jury must be allowed to review any testimony it wished. After considering the issue, realizing the

number of specific questions the jury had, and reviewing the law, the trial court permitted the jurors to use their notes in deliberations. This was done over the objection of both parties. The court also gave the jurors the admonition regarding notes from RCr 9.72. The court did not permit the jury to review the trial testimony, but stated that it could review specific portions if there were further questions.

The trial judge expressed confusion about whether jurors are permitted to take their notes into the jury room during deliberations. This confusion was understandable, given the current state of the law. RCr 9.72 states:

Upon retiring for deliberation the jury may take all papers and other things received as evidence in the case. *The jurors shall be permitted to take into the jury room during their deliberations any notes they may have made during the course of the trial,* but upon request of either party the jury shall be admonished that the notes made by jurors shall not be given any more weight in deliberation than the memory of other jurors.

(Emphasis added).

However, this Court stated in *Harper v. Commonwealth:*

The trial court allowed jurors to take notes for their own use but advised the jury that the notes could not be used to influence other jurors and did not permit the jurors to take the notes into the jury room. We are of the opinion this procedure by the trial judge was proper.

694 S.W.2d 665, 669–70 (Ky.1985). The Court in *Harper* did not make any reference to RCr 9.72, which was amended to its current form in 1981. And no published case since *Harper* has discussed RCr

---

1. Ky. Const. § 110(2)(b).

9.72's requirement that jurors be permitted to take their notes into the jury room. We see no way to reconcile *Harper* with the plain language of RCr 9.72, which is mandatory in permitting jurors to use their notes during deliberations. Therefore, *Harper* is overruled to the extent that it conflicts with the plain wording of RCr 9.72.

RCr 9.72 clearly states that jurors are permitted to take their notes into the jury room during deliberations. Upon request of either party, the court is to admonish the jurors that their notes are not to be given any more weight than the memories of other jurors. *Id.* The trial court gave this admonition. While the trial court initially erred in not permitting the jurors to use their notes, it later corrected this error.

■ Whether to allow the jury to have testimony replayed during deliberations is within the sound discretion of the trial judge. *Baze v. Commonwealth*, 965 S.W.2d 817, 825 (Ky.1997). *See also Thompson v. Commonwealth*, 147 S.W.3d 22, 35 (Ky.2004); *Harris v. Commonwealth*, 134 S.W.3d 603, 610 (Ky.2004). After the trial court permitted the jurors to use their notes, there were no further questions about the evidence, and no further requests to review trial testimony. The court also made it clear that it would allow review of specific trial testimony if the jury requested it. Under these circumstances, the trial court did not abuse its discretion in refusing to allow the jury to review an entire day of trial testimony.

## II. The Trial Court Did Not Abuse Its Discretion In Denying Funds For Additional Expert Witnesses

■ Appellant had an extensive history of substance abuse and mental health issues. On October 12, 2007, the trial court entered an order authorizing defense counsel to employ Dr. Bobby Miller "as a mental health expert for evaluation of the defendant and for the preparation and presentation of the defense as they, in good faith, believe necessary to render effective assistance of counsel." The order also authorized the payment of reasonable fees to Dr. Miller.

Dr. Miller's curriculum vitae was made part of the record. He is a board certified psychiatrist and forensic psychiatrist, who is also board eligible in neurology. He is licensed to practice medicine in West Virginia, Kentucky, and Pennsylvania. His clinical specialties include psychopharmacology and neuropsychiatry. At the time of trial, he was in private practice in Huntington, West Virginia. Among other previous positions, Dr. Miller had served as an assistant professor of neurology at West Virginia University School of Medicine.

Dr. Miller was paid for his services, and apparently evaluated Appellant in November 2007. However, defense counsel did not submit any report by Dr. Miller, and did not call Dr. Miller as a witness at trial. At a November 12, 2007 hearing, defense counsel stated that its expert (Dr. Miller) was evaluating Appellant. The Commonwealth stated that, following that evaluation, it would likely request that Appellant be evaluated at the Kentucky Correctional Psychiatric Center (KCPC). As a result of this anticipated delay by the Commonwealth and the defense, the court continued the January trial date.

On January 23, 2008, the defense gave notice that it would rely on a mental health defense. In response, the Commonwealth requested that Appellant be evaluated at KCPC. The trial court entered an order on February 4, 2008 that Appellant be evaluated by KCPC "to determine the Defendant's mental status at the time of the

alleged offense, as well as, the present mental state of the Defendant."

KCPC staff psychiatrist Dr. Amy Trivette, as well as other KCPC staff, evaluated Appellant with respect to his competency to stand trial and his criminal responsibility. Dr. Trivette submitted a report to the court dated April 1, 2008. In her report, she detailed Appellant's extensive history of psychiatric hospitalization and substance abuse. Dr. Trivette concluded that Appellant was competent to stand trial, and that he could appreciate the criminality of his actions and had the ability to conform his conduct to the requirements of law. Because Appellant reported prior seizures and head trauma, physicians at KCPC ordered an EEG and a head CT. The head CT revealed "mild to moderate supratentorial with mild vermian atrophy possibly associated with chronic alcohol abuse and/or malnutrition." Defense counsel received a copy of the KCPC report on June 16, 2008.

At a June 18, 2008 pretrial conference, defense counsel made a motion for a competency hearing. The Commonwealth then requested that Appellant turn over any reports by Dr. Miller.[2] Defense counsel responded that it had not yet decided whether Dr. Miller would be called as a witness, and expressed the possibility of using Dr. Trivette's report and testimony instead.

On July 2, 2008, the court held a hearing to determine Appellant's competency to stand trial, and to address Appellant's motion to exclude the death penalty due to mental retardation. Dr. Trivette was the sole witness at the July 2 hearing. Following her testimony, the trial court ruled that Appellant was competent to stand tri-al, but reserved ruling on the motion to exclude the death penalty pending further testimony scheduled for July 7.

Following the July 7 hearing, defense counsel filed a motion for funds for two expert witnesses, and for a continuance to allow these experts to be retained. Appellant sought two additional experts: Dr. James Walker, a neuropsychologist, to "help explain the results of the CT scan, EEG tests, and an independent interpretation of the other KCPC tests"; and Dr. Robert Smith, a clinical psychologist and addiction specialist, to "provide testimony as to the effect of intoxicants on [Appellant] at the time of arrest" and to "give further insight following a complete neuropsychological examination as to how intoxicants would specifically affect [Appellant]."

The trial court was reluctant to grant a continuance one day before the trial was scheduled to begin. The court also expressed the opinion that Dr. Miller, as a medical doctor, could offer testimony on the results of the CT scan and the effect of drugs on the body. The trial court ultimately denied Appellant's motions, which Appellant argues was error.

In determining whether an indigent defendant is entitled to funding for an expert witness under KRS 31.110(1)(b), a trial court must consider "1) whether the request has been pleaded with requisite specificity; and 2) whether funding for the particularized assistance is "reasonably necessary"; 3) while weighing relevant due process considerations." *Benjamin v. Commonwealth*, 266 S.W.3d 775, 789 (Ky. 2008). "Upon review, however, this Court's analysis is limited to whether the trial court has abused its discretion." *Id.*

2. At the time, defense counsel had not revealed the identity of its expert. Dr. Miller's name is used for clarity.

(citing *Davenport v. Commonwealth*, 177 S.W.3d 763, 773 (Ky.2005), and *Dillingham v. Commonwealth*, 995 S.W.2d 377, 381 (Ky.1999)).

Dr. Miller, the expert who had already been provided for the defense, was a board certified psychiatrist with specialties in psychopharmacology and neuropsychiatry. The two additional experts requested by Appellant were psychologists—not medical doctors like Dr. Miller. It seems highly unlikely that a psychologist would be more qualified to interpret EEG and CT scan results than Dr. Miller, a medical doctor with a specialty in neuropsychiatry (who had previously served as an assistant professor of neurology and was board eligible in neurology).

We also agree with the trial court that Dr. Miller, as a doctor authorized to prescribe medication, would be perfectly qualified to testify as an expert witness regarding drugs and their effect on the body. This is particularly true given Dr. Miller's specialization in psychopharmacology. In light of Dr. Miller's qualifications, the trial court did not abuse its discretion in concluding that additional experts were not reasonably necessary.

█ Nor was there a violation of Appellant's due process rights. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), "provides that when the mental state of a defendant is seriously in question, due process requires a state to provide access to a competent psychiatrist to assist in evaluation, preparation and presentation of the defense." *Crawford v. Commonwealth*, 824 S.W.2d 847, 850 (Ky. 1992) (internal quotations and citations omitted). However, a defendant is not entitled to additional funds to hire additional experts simply because he is unhappy with the initial expert's conclusions. *Id.*

Dr. Miller never filed a report with the court, nor did he testify at trial. We can only assume that Appellant was not satisfied with Dr. Miller's conclusions. This does not mean that Appellant's due process rights were violated when the trial court refused to provide him with additional experts. "[A]ppellant was afforded the constitutionally and statutorily required expert assistance and, as such, the trial court's refusal to provide additional examinations or funds did not violate his due process rights." *Id.* (citing *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)).

The trial court did not abuse its discretion in refusing to grant funds for additional experts. As this was the reason Appellant requested a continuance, Appellant's arguments regarding the denial of the continuance are moot.

### III. The Trial Court Did Not Err In Finding Appellant Competent To Stand Trial, And Any Error Related To The Production Of Testing Data Was Harmless

█ Appellant argues that the trial court erred in finding him competent to stand trial, and in failing to order KCPC raw testing data to be turned over prior to the competency hearing. The test for a defendant's competency to stand trial is "whether he has substantial capacity to comprehend the nature and consequences of the proceeding pending against him and to participate rationally in his defense." *Commonwealth v. Griffin*, 622 S.W.2d 214, 217 (Ky.1981). *See also Commonwealth v. Wooten*, 269 S.W.3d 857, 865 (Ky.2008); RCr 8.06; KRS 504.100.

After Appellant was evaluated by KCPC, defense counsel filed a motion for discovery of KCPC test materials and results on June 26, 2008. On July 2, 2008, the court held a hearing to determine

whether Appellant was competent to stand trial. Dr. Trivette was the only witness at the competency hearing. She testified that Appellant appreciated the seriousness and consequences of the charges, and that she believed he was capable of participating in his defense. Her uncontroverted testimony was that Appellant was competent to stand trial. Following Dr. Trivette's testimony, the trial court entered a finding that Appellant was competent.

Defense counsel then stated that it would like to present additional evidence of Appellant's mental retardation in support of Appellant's motion to exclude the death penalty. The trial court scheduled a hearing for July 7, 2008, so that Appellant's sisters could testify to Appellant's developmental disabilities. At the July 2 hearing, the court also granted defense counsel access to the KCPC test materials and data.

In support of his argument that he was incompetent to stand trial, Appellant points to IQ tests, testimony by his sisters regarding his slow development, and evidence of his difficulty with daily living. While this evidence is certainly relevant to the issue of possible mental retardation, it has little relation to the issue of Appellant's competency to stand trial. The question of Appellant's mental retardation was relevant to the exclusion of the death penalty. Because Appellant did not receive the death penalty, that issue is moot.

Dr. Trivette's uncontroverted testimony established that Appellant had the capacity to understand the nature and consequences of proceedings against him, and to participate rationally in his own defense. Therefore, in light of the evidence, we cannot say that the trial court abused its discretion, or made a clearly erroneous finding of fact. *See Wooten*, 269 S.W.3d at 865.

With regard to the KCPC data, Appellant's motion requested this data for cross-examination of Dr. Trivette regarding malingering on IQ tests, and for possible mitigation during the penalty phase of the trial. Therefore, the KCPC data had little relation to the issue of Appellant's competency to stand trial, and the judgment of competency was not substantially swayed by any possible error. *See Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky.2009). Therefore, any error in not providing the data sooner was harmless. *Id.*

## IV. No Reversible Error Occurred With Respect To The Testimony of Amanda Hara

▮ Appellant called Amanda Hara, a television news reporter who interviewed Appellant the day after Chief Lacy's death, to testify about her observations. During Hara's interview with Appellant, she apparently stated, "It seems like you're coming down off of something right now," and "You would not have done something like this if you weren't under the influence of drugs."[3] During Hara's testimony, the Commonwealth objected when defense counsel began to repeat Hara's statements from the interview to her. The trial court sustained the objection.

▮ Appellant argues that Hara's statements and her opinion regarding Appellant's intoxication should have been admitted. Appellant's argument conflates Hara's earlier (hearsay) statements that expressed an opinion about Appellant's intoxication with the concept of a witness offering an opinion on intoxication at trial. Appellant is correct that "[i]n Kentucky, a lay witness may testify on the basis of observation and appearance that another

**3.** Defense counsel proffered what Hara would testify to, but no video or transcript of the interview was introduced as an avowal exhibit.

person was intoxicated at a given point in time." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 446 n. 14 (Ky.1997).

However, it is not entirely clear that there was an attempt to ask Hara her lay opinion of Appellant's intoxication. The day before Hara testified, the trial court stated that Hara could not offer an opinion, but could testify to what she observed. Defense counsel never asked Hara her opinion of Appellant's intoxication, but instead attempted to introduce her prior statements. Assuming the trial court prevented Hara from testifying as to her lay opinion of Appellant's intoxication, this was error, but it was harmless. There was a great deal of evidence presented that Appellant was intoxicated at the time of the murder. Therefore, we can say with fair assurance that this error did not substantially sway the judgment. *Winstead*, 283 S.W.3d at 688–89.

 We now turn to the question of whether the trial court abused its discretion in excluding Hara's earlier statements. *See Brewer v. Commonwealth*, 206 S.W.3d 313, 320 (Ky.2006). Hara's prior statements were unquestionably hearsay. Appellant argues that the trial court should have admitted Hara's statements as a recorded recollection under KRE 803(5). However, for a hearsay statement to be admissible as a recorded recollection, it must first be established that the witness has insufficient recollection to testify without the recording. *See Fields v. Commonwealth*, 12 S.W.3d 275, 280 (Ky.2000). It is also unclear what record Appellant intended to use, given that defense counsel was repeating the statements back to Hara.

 Appellant also argues that Hara's statements were admissible as a present

sense impression under KRE 803(1). However, this argument was never made to the trial court, and is not properly preserved for our review. *See Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky. 1976). Nor do we believe that any improper exclusion of Hara's statements rises to the level of palpable error under RCr 10.26.[4]

## V. A Witness's Statement That Appellant Had Been In Trouble Before Did Not Warrant A Mistrial

 During its case-in-chief, the Commonwealth called Garland Lacy, the victim's brother, to testify. Garland Lacy was employed with the Powell County Sheriff as a bailiff. During direct examination, the prosecutor asked Lacy if he knew Appellant. Lacy responded, "I really didn't. I understand that he had been in court some and in trouble some but I didn't. . . ."

Appellant objected, and moved for a mistrial. The prosecutor responded that he did not expect Lacy to give that answer, expecting him instead to simply state that he knew Appellant from the community. The prosecutor requested that the court admonish the jury to disregard the statement. The trial court denied Appellant's motion for a mistrial, but admonished the jury to disregard Lacy's last statement.

 Appellant argues that he was entitled to a mistrial based on Lacy's statement. It is undisputed that the statement was inadmissible evidence of prior bad acts under KRE 404(b). The question is whether the trial court's admonition was sufficient to cure the error. "A jury is presumed to follow an admonition to disre-

---

**4.** In his reply brief, Appellant has requested palpable error review of several unpreserved issues.

gard evidence and the admonition thus cures any error." *Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky.2003) (citing *Mills v. Commonwealth,* 996 S.W.2d 473, 485 (Ky.1999)).

> There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant, or (2) when the question was asked without a factual basis *and* was "inflammatory" or "highly prejudicial."

*Johnson,* 105 S.W.3d at 441 (emphasis original) (internal citations omitted).

Lacy's statement was isolated and ambiguous. It did not refer to any specific act by Appellant. There is simply no reason to believe the jury was unable to follow the trial court's admonition. Further, Lacy's statement was an unexpected response to an innocuous question by the prosecutor. The trial court's admonition cured the error.

## VI. There Was No Reversible Error Stemming From Appellant's Request For Production Of The Victim's KASPER Data Or From The Testimony Of The Victim's Physician

▇▇▇ Prior to trial, Appellant filed a motion for discovery of a complete KASPER[5] report on the victim Randy Lacy, showing all controlled substances Chief Lacy legally obtained since 2007. The medical examiner's report revealed that Chief Lacy had hydrocodone and other drugs in his system at the time of his death. Appellant sought production of Chief Lacy's KASPER report to deter-

mine whether these drugs had been prescribed, which Appellant argued could be relevant in mitigation of punishment.

Appellant never obtained a ruling on his motion for discovery; therefore, the issue is not properly preserved for review by this Court. *See Brown v. Commonwealth,* 890 S.W.2d 286, 290 (Ky.1994). Rather, defense counsel conceded that the KASPER data was not relevant to Appellant's guilt or innocence, but only relevant in mitigation of punishment. The issue of mitigation became moot when Appellant agreed to a sentence.

▇▇▇ Nor do we find any palpable error. This Court recently held that a criminal defendant's constitutional right to exculpatory information must prevail over statutes and rules preventing disclosure of KASPER data, provided the defendant makes a showing that the data does in fact contain exculpatory information. *Commonwealth, Cabinet for Health & Family Serv. v. Bartlett,* 311 S.W.3d 224, 227 (Ky. 2010) (establishing for KASPER data the procedure outlined in *Commonwealth v. Barroso,* 122 S.W.3d 554 (Ky.2003)). Appellant made no showing that Chief Lacy's KASPER data contained exculpatory information.

▇▇▇ Because Appellant was not granted access to Chief Lacy's KASPER data, he alleges error in Dr. Julie Keenon, one of Appellant's physicians, being permitted to testify. Appellant elicited on cross-examination of the medical examiner that Chief Lacy had hydrocodone in his system at the time of his death. In response, the Commonwealth called Dr. Keenon to testify that the medications found in Chief Lacy's system after his death had been prescribed to him. Dr. Keenon testified only after Appellant had opened the door regarding Chief Lacy's medications. In

5. Kentucky All–Schedule Prescription Electronic Reporting.

addition, defense counsel was permitted to inspect all of Dr. Keenon's medical records on Chief Lacy prior to her testifying. There was no error.

## VII. The Trial Court Did Not Abuse Its Discretion In Permitting Blaze Tomlin To Be Cross–Examined Regarding Possible Motive For Bias

 During his case-in-chief, Appellant called Blaze Tomlin, an attorney with the Department of Public Advocacy (DPA), who was assigned to speak to Appellant when he was taken to the hospital just after his arrest. Tomlin testified to Appellant's state of extreme intoxication.

Early in the Commonwealth's cross-examination, the prosecutor asked a number of questions about Tomlin's background.

Prosecutor: Where did you complete your legal education?

Tomlin: Ohio Northern University

. . . .

Prosecutor: Are you a native of Ohio?

Tomlin: I am. Southern Ohio.

Prosecutor: How long have you lived in Kentucky?

. . . .

Tomlin: Five and a half years.

. . . .

Prosecutor: Did you come to Kentucky to join the Department of Public Advocacy?

Tomlin: No, sir.

. . . .

Prosecutor: Have you worked as an attorney for any law firm for yourself or in any capacity other than the Department of Public Advocacy?

. . . .

Prosecutor: You're a full-time employee of the Department of Public Advoca-

cy, the same as Mr. Jones [Appellant's attorney]?

 Appellant raises two objections to the Commonwealth's questions: that the questions about Tomlin's background were irrelevant, and that Appellant was prejudiced when his attorney was revealed to be a public defender. We review a trial court's evidentiary rulings for an abuse of discretion, i.e. "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

 The credibility of a witness is always at issue. *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky.1997); KRE 611(b) ("A witness may be cross-examined on any matter relevant to any issue in the case, including credibility.") The trial court also maintains broad discretion to regulate cross-examination. *Maddox*, 955 S.W.2d at 721.

The fact that Tomlin and Appellant's attorney both worked for the Department of Public Advocacy was relevant to Tomlin's credibility, as it showed a possible motive for bias. As the trial court pointed out, if a witness worked at the same law firm as an attorney in the case, this would be a relevant subject for cross-examination.

The Commonwealth's questions about Tomlin's background, we believe, were intended to demonstrate that Tomlin had moved to Kentucky to work for DPA, and thus to show a possible motive for bias. The questions, however, could have been phrased differently, and it is concerning that the Commonwealth attempted to portray Tomlin—in the words of defense counsel—as a "foreigner." However, we cannot say that the trial court abused its discretion in allowing the questions, which were relevant to the issue of possible bias.

Nor do we believe there was any identifiable prejudice to Appellant resulting

from his attorney being "unmasked" as a public defender. There is nothing inherently prejudicial about having an attorney who is a public defender. The probative value of Appellant's counsel and Tomlin being employed by the same agency is not substantially outweighed by the danger of undue prejudice. KRE 403. The trial court did not abuse its discretion.

## VIII. Issues Related To The Testimony Of Appellant's Wife Are Not Preserved

Appellant argues that the trial court erred in failing to admit the testimony of Appellant's wife Roberta Barnett regarding statements Appellant made the morning of the murder. Mrs. Barnett began to testify that Appellant said, "I love you; I'll be right back," and that he said he was going to run somewhere. At this point, her testimony was cut off by the Commonwealth objecting to the hearsay. However, before the trial court could rule on the objection, defense counsel instructed Mrs. Barnett that she could not testify as to what anyone said.

While Appellant argues that the statements were either not hearsay or were admissible under a hearsay exception, it is clear that the issue is not preserved. The trial court never had an opportunity to rule; therefore, the court could not have erred. Nor does the failure to allow this testimony rise to the level of palpable error under RCr 10.26.

## CONCLUSION

For the forgoing reasons, the judgment of the Montgomery Circuit Court is hereby affirmed.

All sitting. All concur.