Kenneth MALONE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000491–MR.

Supreme Court of Kentucky.

April 26, 2012.

---

12. Findings nos. 18–19, 31.

Julia Karol Pearson, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Jason Bradley Moore, Assistant Attorney, General Office of Criminal Appeals Attorney General's Office, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Kenneth Malone appeals as of right from a June 24, 2010 Judgment of the Jefferson Circuit Court convicting him of murder (KRS 507.020) and sentencing him, in accord with the jury's recommendation, to thirty-two years in prison. Malone was found guilty of the November 22, 2008 handgun slaying of Montez Stewart in Louisville. He raises four issues on appeal: (1) that he was denied his right to present a complete defense; (2) that the trial court erred by denying his motion for a directed verdict; (3) that the trial court erred by instructing the jury on alternative theories of murder; and (4) that he was denied his right to be present when the court responded to the deliberating

jury's requests for additional information. Finding no reversible error, we affirm.

### RELEVANT FACTS

Moritez Stewart was killed at about 7:30 pm on November 22, 2008 at the home of Stephon Murphy on Louisville's Boling Avenue. Murphy testified that he and Stewart had been good friends in the past and had recently renewed their friendship. Murphy had converted one of his home's front rooms into a sort of recording studio where he and his acquaintances composed and recorded the background music—the "beats"—for rap songs as well as the rap lyrics. It was not unusual for several people to gather at Murphy's home either to participate in rapping or to listen as others did so. According to Murphy and to the Commonwealth's other principal witness, Deonte Hudson, who testified that he and Stewart had been close friends since childhood, Malone was in Murphy's studio on the evening of November 22 working on or listening to a rap beat when Stewart and Hudson arrived there to visit with Murphy and to hear the music. Almost immediately upon arriving, according to the two witnesses, Stewart began rapping to Malone's beat, and something about his performance seemed to upset Malone. Malone abruptly left the house and when he returned just a minute or two later he approached Stewart until their faces were only inches apart. Stewart, according to Hudson, responded by rapping more loudly, whereupon Malone pulled out a gun and shot Stewart several times. Hudson testified that at first he thought that one of the sound system's speakers had "blown," but after the second shot Stewart dropped to his hands and knees, and he, Hudson, saw the gun in Malone's hand. Malone fired a third shot as Hudson was attempting to come to Stewart's aid. At that point Malone waved the gun at Hudson and said, "Get him out of here." Before Hudson could do anything, however, Malone fired two more shots at Stewart and then ran from the house.

Stewart, meanwhile, had been crawling toward the door. Bleeding profusely, he managed to crawl outside onto the front porch, where he collapsed. That is where police officers and paramedics found him. He was taken by ambulance to the University of Louisville Hospital and died there shortly after his arrival. According to the medical examiner, Stewart was shot five times, twice in the chest, once in the abdomen, and twice in the thigh. The three upper body shots and one of the thigh shots all caused severe bleeding. The medical examiner concluded that Stewart died as a result of injuries sustained from multiple gun shots.

At trial, although their testimonies differed in a number of particulars, Murphy and Hudson both positively identified Malone as Stewart's assailant. Hudson testified that he saw Malone fire the fatal shots, and Murphy testified that while he did not actually see the gun in Malone's hand, he did see Malone standing above Stewart immediately after he heard the shots, and he then saw Malone run from the scene. The statements Murphy and Hudson initially gave to the police, however, were not quite so definite.

Both men had been with Stewart when the police arrived and both were interviewed later that evening. Because a car registered to Malone was parked in front of Murphy's house, detectives suspected Malone's involvement and so prepared a photo pack that included a picture of him. Hudson, who did not know Malone, initially told the detective that the shooter was wearing a hood and that he had not gotten a good look at his face. He picked Malone's picture from the photo pack, but told the officer that he was not sure that was

the shooter. At trial, Hudson testified that he had not been completely honest with the detective. He had pretended, he said, to be less certain than he was that Malone was the shooter, because he hoped that Malone would not be arrested but would be subjected to "street justice" instead.

Murphy, who knew Malone, Malone being his girlfriend's cousin, initially told the detective that the shooter was a person named, "Bill," and he picked from the photo pack a picture other than Malone's. A short time later, however, when shown the photo pack again, Murphy admitted that his earlier identification had been false. The second time he picked out the picture of Malone. At trial, Murphy explained that he had lied to the detective initially because he did not want to be involved.

Malone's defense was primarily an attempt to discredit Hudson's and Murphy's accounts of the shooting and their in-court identifications of him as the killer. In addition to underscoring their initial police statements doubting or denying Malone's involvement, Malone presented the testimony of Perry McDonald. McDonald is Malone's uncle and the uncle of Murphy's girlfriend. In November 2008 he was living with his niece and Murphy at Murphy's house. He testified that during the evening of November 22, he had come upstairs from his basement quarters and was in a hallway outside Murphy's studio when he heard what he first thought was two people rapping. The rapping, however, turned into arguing, followed shortly by gunshots. He looked into the studio and saw a tall man with a goatee, who, he assumed, was the shooter. According to McDonald, Malone was not present. Frightened by the situation, he went downstairs to his room. A short time later, McDonald testified, Murphy came down and told him to tell the police that Malone was the shooter.

On the night of the shooting McDonald had given the police a very different account of the incident, and when, during cross-examination, he had trouble recalling that statement, a recording of it was played for the jury. In that statement, McDonald told a detective that he had witnessed Malone and Stewart in Murphy's studio seemingly trying to out-rap each other and soon thereafter had heard shots. He claimed at first not to have seen the shooting, but admitted later that he had seen Malone holding a gun and pointing it at Stewart. When shown the photo pack, he had picked out Malone's picture as that of the shooter. Having listened to the recording of his statement, McDonald testified that he fabricated much of it because Murphy had asked him to do so.

As noted, the jury rejected Malone's defense, and Malone now claims that the development of that defense was unfairly limited by the exclusion of evidence bearing on Hudson's and Murphy's credibility and on their possible involvement as perpetrators. We begin our analysis with a consideration of this assertion of error.

## ANALYSIS

### I. Malone Was Not Denied an Opportunity to Present a Defense.

■ Prior to trial, the Commonwealth moved to exclude evidence concerning Stewart's criminal history and his blood-alcohol content at or near the time of his death. Malone objected and argued that such evidence could prove relevant as bearing on someone else's motive for killing Stewart. The trial court acknowledged Malone's concern and granted the Commonwealth's motion only to the extent of ruling that before such evidence was

elicited the parties were to approach the bench and discuss whether the evidence had become relevant. At no point during the trial did Malone seek to introduce such evidence, although he did, without objection, elicit from Hudson testimony to the effect that he and Stewart spent virtually the entire day prior to the shooting drinking beer and visiting.

During his cross-examination of Murphy, Malone established that at the time of the shooting Perry McDonald resided at Murphy's house and then asked whether McDonald was a "drinker." The Commonwealth objected on the ground that impeachment of McDonald was inappropriate since McDonald was not to be one of the Commonwealth's witnesses and that otherwise McDonald's being a drinker was irrelevant. Malone countered by arguing that "what went on in the house" such as drinking, smoking, and parrying was relevant. Sustaining the objection, the trial court ruled that while Malone could perhaps pursue more general questions concerning the "atmosphere in the house," the particular question about McDonald was not to be admitted. Rather than asking Murphy more general questions about his house and what went on there, however, Malone moved on to a new topic. Later, when Malone called McDonald as a defense witness, McDonald testified, without objection, that he drank every day and spent much of the day of the shooting in his basement room drinking gin.

Malone contends that these rulings by the trial court—the ruling requiring a showing of relevance before evidence of the victim's criminal history and blood alcohol content could be elicited and the ruling excluding Murphy's answer to the question about McDonald's drinking— somehow denied him a fair opportunity to establish the context of the crime and to show that Hudson and Murphy were un-worthy of belief and could have been involved in Stewart's death. We disagree.

■ Malone is correct, of course, that under both the Kentucky and the United States Constitutions, he has the right to present a complete and meaningful defense. *Beaty v. Commonwealth,* 125 S.W.3d 196 (Ky.2003); *Holmes v. South Carolina,* 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). This right includes both the right to confront witnesses against him with evidence reasonably suggestive of bias, *Beaty, supra; Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), as well as the right to present evidence reasonably suggestive that someone else committed the charged crime. *Beaty; Holmes, supra.* A defendant is not at liberty, however, "to present unsupported theories in the guise of cross-examination and invite the jury to speculate as to some cause other than one supported by the evidence." *Davenport v. Commonwealth,* 177 S.W.3d 763, 772 (Ky. 2005) (citing *Commonwealth v. Maddox,* 955 S.W.2d 718 (Ky.1997), internal quotation marks omitted).

■ The mere fact that a victim had a criminal record or had alcohol in his blood, or the fact that a witness drank, used drugs, and knew other people who did, does not, without more, permit a reasonable inference either that the crime was drug or alcohol related or that the witness was lying or was involved in the crime. *Cf. Brown v. Commonwealth,* 313 S.W.3d 577 (Ky.2010) (holding that evidence of murder victim's drug use was properly excluded where there was no evidence tending to show that murder was drug related). Absent evidence, therefore, that Hudson or Murphy had killed Stewart or had a motive and opportunity to do so, or that they had reason to be biased against Malone or in favor of the Commonwealth, Malone's attempts—largely successful—to

impugn their characters and the characters of their associates Stewart and McDonald was nothing more than an invitation to the jury to speculate about causes not supported by the evidence. The trial court did not abuse its discretion, therefore, by limiting as it did the evidence of Stewart's criminal record and blood alcohol content, or by disallowing as irrelevant the question asked of Murphy regarding McDonald's drinking.

 In a final argument in this area, Malone complains of what he asserts was an improper closing argument by the prosecutor. In his closing, the prosecutor responded to claims by Malone that Murphy's house was "unsavory" by noting that the only evidence of such unsavoriness came from McDonald, who admitted having drunk alcohol and used drugs at Murphy's house on the day of the shooting and who claimed to have seen others there smoking marijuana. Malone contends that the prosecutor's objections to the evidence about Stewart and about McDonald being a drinker made it improper for him to then refer to the lack of that evidence. A prosecutor, of course, "is entitled to draw reasonable inferences from the evidence, make reasonable comment upon the evidence and make a reasonable argument in response to matters brought up by the defendant." *Childers v. Commonwealth*, 332 S.W.3d 64, 73 (Ky.2010). Had the trial court's evidentiary rulings been incorrect, the prosecutor's remark might be some indication that the error was not harmless. Because the trial court rulings were not incorrect, however, there was no error for the prosecutor to exacerbate. On the contrary, it is not improper for the prosecutor to object to inadmissible evidence offered in support of a defense position, and then, if admissible evidence is not forthcoming, to comment on the lack of support for that position. That is all that happened here. The prosecutor's remark was a reasonable comment on the evidence.

## II. Malone Was Not Entitled to a Directed Verdict.

 Malone next contends that the trial court erred when it denied his motion for a directed verdict.[1] As he correctly asserts, under both the common law of this state and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Commonwealth bore the burden of proving each element of his alleged offense beyond a reasonable doubt. *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky.1991); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard requires more of the Commonwealth than mere speculation. *Hodges v. Commonwealth*, 473 S.W.2d 811, 814 (Ky.1971) ("Suspicion alone is not enough."). The Commonwealth must produce evidence of substance. Evidence that amounts to no more than a scintilla of proof is grounds for a directed verdict. *Benham*, 816 S.W.2d at 187–88. A directed verdict is not appropriate, however, if, construed favorably to the Commonwealth, the evidence would permit a rational juror to believe the defendant guilty beyond a reasonable doubt. *Beaumont v. Commonwealth*, 295 S.W.3d 60 (Ky.2009) (citing *Benham*). In other words, in deciding upon the propriety of a directed verdict,

1. As the Commonwealth notes and as Malone concedes, this issue was not properly preserved. At the close of the Commonwealth's case, Malone summarily moved for a directed verdict, but he did not renew the motion at the close of his own case. We need not decide what effect the procedural gaffe might have on the standard of review, since even under the standard applied to properly preserved directed verdict motions, Malone is not entitled to relief.

the court, either trial court or reviewing court, must presume that if the evidence supports conflicting inferences the conflict will be resolved in favor of the prosecution. *Cf. McDaniel v. Brown*, ── U.S. ──, 130 S.Ct. 665, 175 L.Ed.2d 582 (2010) (explaining the "rational juror" standard required under the Due Process Clause and citing *Jackson v. Virginia*). The credibility of witnesses, likewise, is generally left for the jury to determine. *Potts v. Commonwealth*, 172 S.W.3d 345 (Ky.2005) (citing *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808(1995)).

As in any criminal prosecution, the Commonwealth was obliged here to prove that a crime occurred and that the defendant was the perpetrator. Malone does not dispute that a crime occurred, a finding more than amply supported by Stewart's fatal injuries and the testimonies of those who were present when he was shot. Malone contends, however, that the Commonwealth failed to prove that he was the perpetrator. Given Hudson's and Murphy's in-court identification of him as the shooter, as well as the photo pack identifications of him that Hudson, Murphy, and McDonald made on the night of the shooting, Malone's contention borders on the frivolous. Construing the identification evidence in the light most favorable to the Commonwealth, as we must to assess the correctness of the trial court's directed verdict ruling, it would seem clear that a rational juror could conclude that Stewart was murdered and that Malone was the killer.

Undaunted, Malone maintains that the three witnesses' pretrial descriptions of him were so inconsistent and their photo pack identifications of him so uncertain, that no rational juror could have been satisfied from that evidence that he was the culprit. The night of the shooting, the three witnesses did indeed give the police somewhat varying descriptions of how the shooter was dressed. Hudson remembered a black coat with the hood pulled up and black pants. Murphy told the investigator that the shooter wore a red, long-sleeved shirt, black jeans, and a black toboggan. McDonald dressed the shooter in a white t-shirt and jeans and said nothing about a hood or toboggan. These inconsistencies, Malone maintains, together with Hudson's initial statement that he was unsure whether the photo pack picture of Malone depicted the shooter, Murphy's statement that the shooter was named "Bill" and his initial pointing to one of the photo pack pictures other than Malone's, and McDonald's disavowal at trial of his initial identification of Malone, should have left a rational juror with a reasonable doubt that Malone was involved. This argument misconceives the directed verdict standard. The standard is not whether, construed favorably to the defendant the evidence might support an acquittal; the standard is whether construed favorably to the Commonwealth the evidence could reasonably support a conviction. A juror crediting Hudson's. and Murphy's trial testimony and McDonald's police statement could reasonably conclude that all three men, notwithstanding the discrepancies in how they remembered Malone's attire, witnessed a confrontation between Malone and Stewart that grew out of a rap session and culminated in Stewart's murder.

■■■ In support of his argument, Malone refers us to cases addressing the admissibility of pre-trial identification evidence including pre-trial photo identifications. Under this case law, the pretrial identification should be excluded if it arose from an unnecessarily suggestive identification procedure and if the circumstances in their totality suggest that the identification is unreliable. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243,

53 L.Ed.2d 140 (1977); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Ledbetter v. Edwards,* 35 F.3d 1062 (6th Cir.1994). Here, of course, there was no challenge to the admissibility of the three witnesses' photo pack identifications of Malone, but had there been the evidence would clearly have been admissible. The array of photos shown to the witnesses was in no way suggestive of Malone, and there was virtually no possibility much less a substantial one that Murphy and McDonald, who knew Malone, had mistakenly picked out his picture. That Hudson picked out the same picture was then a strong indication that his identification, too, was not a mistake. As the Supreme Court has noted, in these circumstances, *i.e.,* short of a showing that suggestive identification procedures have created a substantial likelihood of irreparable misidentification,

> [the identification] evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

*Manson v. Brathwaite,* 432 U.S. at 116, 97 S.Ct. 2243. The trial court did not err here by leaving to the jury the assessment of the evidence identifying Malone as the person who shot and killed Montez Stewart.

### HI. The Jury Instructions Did Not Compromise Malone's Right to a Unanimous Verdict.

Malone was accused of having committed murder in violation of KRS 507.020. Under that statute murder may be committed in either of two ways:

A person is guilty of murder when:

(a) With intent to cause the death of another person, he causes the death of such person or of a third person; . . . or

(b) . . . under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

When the trial court instructed the jury, it followed the pattern instruction from 1 Cooper, *Kentucky Instructions to Juries (Criminal),* § 3.24, and gave the jury the option of finding Malone guilty of either intentional or wanton murder without requiring it to specify which theory it chose. Such an instruction, often referred to as a "combination" instruction, permits a guilty verdict even though some of the jurors believed the killing intentional and others wanton. We have held that this ambiguity does not deprive the defendant of a unanimous verdict, as required by this State's Constitution, provided that the evidence reasonably supports both theories of the crime. *Robinson v. Commonwealth,* 325 S.W.3d 368 (Ky.2010); *Beaumont,* 295 S.W.3d 60. Malone contends, however, that evidence of wantonness is lacking in this case, and that therefore the inclusion in the instructions of the wanton murder option was an error depriving him of a unanimous verdict. We disagree.

Malone is correct, of course, that instructions not supported by the evidence should not be given, *Houston v. Commonwealth,* 975 S.W.2d 925 (Ky.1998), and that a combination instruction, such as the murder instruction here, violates the unanimous verdict requirement if either theory of the crime lacks evidentiary support and there is a reasonable possibility that some member or members of the jury actually relied on the erroneously included

theory. *Travis v. Commonwealth*, 327 S.W.3d 456 (Ky.2010) In *Hayes v. Commonwealth*, 625 S.W.2d 583 (Ky.1981), for example, we held that an alternative murder instruction violated the unanimous verdict requirement because the only evidence of the defendant's state of mind came from his confession, which indicated an intentional rather than a wanton killing. In *Foster v. Commonwealth*, 827 S.W.2d 670 (Ky.1991), we upheld the denial of instructions on unintentional homicide because the manner of killing—the victims were shot at close range, were repeatedly stabbed, were run over by an automobile, and were burned—permitted no inference but an intent to kill. Similarly, in *Moore v. Commonwealth*, 771 S.W.2d 34 (Ky. 1988), we upheld the denial of a second-degree manslaughter instruction where the victim's having been shot four times in the head, with one of the wounds being a contact wound, would have made a wantonness finding unreasonable.

▮▮▮▮ As noted, however, if the evidence supports both theories, a combination instruction does not implicate unanimous verdict concerns. *Benjamin v. Commonwealth*, 266 S.W.3d 775 (Ky.2008); *Johnson v. Commonwealth*, 12 S.W.3d 258 (Ky.1999). Where direct evidence of the defendant's state of mind is lacking, or is unclear, or is at odds with other evidence that can be deemed substantial, we have held that intent to kill can be inferred from the extent and character of the victim's injuries and from the defendant's actions preceding and following the charged offense, but "whether a defendant actually has an intent to kill remains a subjective matter," *Hudson v. Commonwealth*, 979 S.W.2d 106, 110 (Ky.1998), and other inferences are not ruled out. "The state of [the defendant's] mind at the time of the killing is almost never clear, not even to the defendant himself.... To say

that the method and means of [the victim's] death only support an instruction on intentional murder is to make the inference of intent mandatory." *Id.* at 110. Accordingly, we have upheld alternative murder instructions where the evidence supported an inference of intent, but also included substantial indications that the defendant "went crazy" or otherwise may have killed wantonly in an emotionally wrought state. *Johnson, supra; Hudson, supra. See also, Ratliff v. Commonwealth*, 194 S.W.3d 258 (Ky.2006) (noting some of the evidentiary scenarios that could support a wanton murder instruction). If a rational juror could doubt that the defendant killed intentionally, but believe that he killed wantonly, and vice-versa, then a combination instruction is appropriate.

That is the case here. As the Commonwealth argued at trial, Malone's having shot Stewart five times at close range, including three shots to Stewart's torso, permits an inference that he intended to kill. The shots were not so inherently lethal, however, as to rule out other possibilities, and indeed the witnesses testified that the shooting seemed to erupt from Malone's having become violently upset about something in Stewart's rapping. In those circumstances, the fact that Malone fired five shots in rapid succession, most of them toward the lower part of Stewart's body, could be thought to imply not that Malone was determined to kill Stewart, but that indifferent to Stewart's life and ignoring the obviously grave risk he was creating, he shot in an outburst of anger to punish Stewart for slights, whether real or imagined. Because a rational juror could thus believe either that the killing was intentional or that it was aggravatedly wanton, the trial court did not err by giving a combination murder instruction.

Malone also contends that the murder instruction was flawed because it did not require the jury unanimously to agree on either wantonness or intent. He correctly notes that this Court has on occasion expressed the view that "the preferred practice is to include a form verdict that requires the jury to state whether guilt is found under the theory of intentional murder or under the theory of wanton murder." *Hudson*, 979 S.W.2d at 110; *see also Benjamin*, 266 S.W.3d 775 ("better practice" is to require jury to specify the theory upon which it relied). Experience has taught, however, that this "preference" cannot be reconciled with the fact that, where, as here, both theories are supported, a unanimous verdict may be returned even though some jurors favor one theory and some the other. *Robinson, supra.* Because the bifurcated verdict form Malone seeks would preclude this latter sort of valid verdict, the bifurcated form is not required. The trial court did not err, in other words, by not bifurcating the combination instruction or accompanying verdict form.

## IV. Malone's Absence During the Trial Court's Initial Consideration of the Deliberating Jury's Request For Additional Information Does Not Entitle Him to Relief.

Finally, Malone contends that the trial court erred when, during the jury's deliberations, it addressed juror questions in his absence. He complains of two separate incidents. The first occurred a little more than an hour after the jury retired. At that point the jury sent a note to the court asking, in a series of four questions, for additional evidence.[2] Without bringing Malone back to the courtroom, the court consulted with counsel for both parties and, with counsels' concurrence, informed the jury that no additional evidence could be given it. About an hour later, the jury sent out a second note asking to rehear the recording of Perry McDonald's police statement. Again the court consulted with counsel, and, counsel agreeing that to be reheard at all McDonald's testimony should be replayed for the jury in its entirety, the court gave the jury that option. The video record then reflects that McDonald's testimony was indeed replayed, but it does not indicate who was present in the courtroom during the replaying.

Citing RCr 9.74, Malone maintains that he was entitled to be present when the court considered how to address the jury's questions and when it replayed McDonald's testimony. RCr 9.74 provides that

> [n]o information requested by the jury or any juror after the jury has retired for deliberation shall be given except in open court in the presence of the defendant (unless the defendant is being tried in absentia) and the entire jury, and in the presence of or after reasonable notice to counsel for the parties.

Additionally, RCr 8.28 provides in pertinent part that "[t]he defendant shall be present at the arraignment, at every critical stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of the sentence."

Although our case law includes few reported decisions construing these rules, and none addressing the issues Malone has raised, we find the United States Supreme Court's construction of the similar federal rules to be helpful. That Court has held that when a federal trial court is

---

**2.** The jury asked whether fingerprint testing was performed on the shell casings, when the photo pack picture of Malone was taken, where Malone's keys were found and whether Malone had an outstanding warrant on November 22, 2008.

confronted with an inquiry by a deliberating jury, "the jury's message should [be] answered in open court and ... [defendant's] counsel should [be] given an opportunity to be heard before the trial judge respond[s]." *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). *See Welch v. Commonwealth,* 235 S.W.3d 555 (Ky.2007) (holding that the trial court's *ex parte* responses to the deliberating jury's substantive inquiries constituted a reversible violation of RCr 9.74). *See also Watkins v. Commonwealth,* 105 S.W.3d 449 (Ky.2003) (noting RCr 8.28's roots in the Confrontation and Due Process Clauses of the United States Constitution). We agree with Malone that this procedure is best observed if the defendant is present both as the response is being formulated and when it is delivered. We recognize, however, that not all jury inquiries are substantive, that some will not require or allow for a substantive response, and that some will call for responses that need little discussion. In many cases, therefore, the failure to secure the defendant's presence before a response is decided upon may be deemed harmless, the test being whether the defendant's reaction to the jury's question or request could have been of use to counsel or have had some bearing on the court's response. *Cf. United States v. Patterson,* 23 F.3d 1239, 1255 (7th Cir.1994) ("The failure to secure the defendant's presence is harmless if the issue involved is not one on which counsel would be likely to consult [the defendant], or if it is not one for which the defendant, if consulted, would be likely to have an answer that would sway the judge." (citation and internal quotation marks omitted)).

■ Here, Malone's counsel was given an opportunity to be heard, and Malone does not challenge the correctness of the trial court's responses to the jury's questions, nor does he suggest that his presence while those responses were being formulated might have been useful to counsel or the court. Counsel concurred in the court's denial of the jury's request for additional evidence, a denial in clear accord with the general rule that new evidence will not be admitted after the case has been submitted to the jury. *Stokes v. Commonwealth,* 275 S.W.3d 185 (Ky.2008) (recognizing an exception to the rule). Malone's counsel objected to the replaying of Perry McDonald's testimony on the ground that that testimony would thus be given undue weight. To guard against that possibility, the court required the jury to rehear McDonald's entire testimony, not just his police statement. In *Barnett v. Commonwealth,* 317 S.W.3d 49 (Ky.2010), we reiterated that "[w]hether to allow the jury to have testimony replayed during deliberations is within the sound discretion of the trial judge." *Id.* at 55. Apparently conceding that the trial court's decision to allow the replaying was within its discretion, Malone has not pursued on appeal his objection to the replaying. Because the issues raised by the jury's requests in this case were purely legal ones concerning which counsel is not apt to have consulted Malone or Malone's reaction to have affected the court's responses, the failure to secure Malone's presence during the formulation of those responses was harmless error at worst and so does not entitle Malone to relief. *Cf. Watkins,* 105 S.W.3d at 453 (finding no violation of RCr 8.28 in the defendant's absence from the jury instruction colloquy and remarking that "[i]n Kentucky, it is not reversible error to conduct legal arguments between court and counsel outside the presence of the defendant." (citation and internal quotation marks omitted)).

Malone also contends that he was denied his right under RCr 9.74 to be present while McDonald's testimony was being re-

played. As discussed above, we agree with Malone that under the rule, if the deliberating jury receives additional instruction or is allowed to rehear testimony, the instruction or the rehearing should take place in open court before the entire jury, and the defendant should be present, unless he chooses not to be. We need not decide, however, whether and if so under what standard a violation of this rule might be deemed harmless, because we agree with the Commonwealth that there was no violation.

■ It is true, as Malone points out, that the video record shows that McDonald's testimony was replayed, but fails to show who was present during the replaying. Was Malone present? A truly silent record might entitle Malone to the benefit of the doubt. We need not decide that point, however, because, as the Commonwealth notes, the record here is not truly silent. It includes a letter Malone addressed to the trial court on June 9, 2010, after his April 2010 trial. In the letter Malone lists several reasons why, in his view, he should be granted a new trial. Among his complaints is the following: "After deliberating for nearly three (3) hours, the jury could not come up with a verdict. I was brought back into the courtroom and was told that the jury wanted to listen to a recorded statement of one of the witnesses. Again, my attorney failed to properly object." Since McDonald's was the only testimony the jury reheard, we are satisfied that Malone was in fact "brought back into the courtroom" for that rehearing and accordingly that his claim for relief under RCr 9.74 must fail.[3]

### CONCLUSION

In sum, Malone received a fundamentally fair trial and, accordingly, we affirm his conviction. Malone was not denied an opportunity to present a defense when the trial court conditionally excluded evidence of the victim's and one of the witness's bad character, since Malone did not establish that the evidence was relevant to some issue in the case. Hudson's, Murphy's, and McDonald's identifications of Malone as Stewart's assailant were in no way tainted by suggestive police procedures, and so were properly submitted to the jury for its appraisal of their trustworthiness. Malone's assault on Stewart was sufficiently lethal to permit an inference that he intended Stewart's death, but it was not so inherently lethal as to rule out the possibility that he shot wantonly without that intent, and so a combination murder instruction was appropriate. Finally, while it would have been preferable for the trial court to have included Malone in the discussions regarding the deliberating jury's requests for additional evidence and for the replaying of McDonald's testimony, since Malone's input to those purely legal discussions is not apt to have been of aid either to counsel or to court, his absence from them was harmless and cannot be deemed a ground for relief. The record supports the conclusion that Malone was present in the courtroom when the McDonald testimony was replayed. Accordingly, we affirm the June 24, 2010 Judgment of the Jefferson Circuit Court.

All sitting. All concur.

---

**3.** The better practice is to record the jury's return to the courtroom with some statement made on the record by the judge as to the presence of counsel and the defendant followed by the judge's explanation that the jury is about to hear the replayed testimony of the witness whose testimony they asked to hear. Here, but for Malone's letter, there would have been no record regarding Malone's presence.