RENDERED:  FEBRUARY 24, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0186-MR

JOSEPH CAPSTRAW                                APPELLANT

                    ON APPEAL FROM HARDIN CIRCUIT COURT
V.                         HONORABLE KELLY EASTON, JUDGE
                             NO. 18-CR-00696

COMMONWEALTH OF KENTUCKY                    APPELLEE

## OPINION OF THE COURT BY JUSTICE LAMBERT

## AFFIRMING IN PART AND VACATING IN PART

Joseph Capstraw (Capstraw) was convicted of murder and sentenced to fifty years of imprisonment following a jury trial.  He brings this appeal as a matter of right.[1]  He asserts that his conviction must be reversed because: (1) the trial court allowed the admission of eight gruesome photographs that did not satisfy a KRE[2] 403 balancing test; (2) the jury instructions violated his right to a unanimous verdict; and (3) his Confrontation Clause[3] rights were violated.  He further argues that the jail fees imposed against him must be vacated.  For the reasons that follow, we affirm Capstraw's conviction but vacate the jail fees imposed against him.

---

[1] Ky. Const. § 110.

[2] Kentucky Rule of Evidence.

[3] *See* U.S. Const. amend. VI.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Approximately two months before the events at issue in this case, Capstraw met the victim, eighteen-year-old Amber Robinson (Amber). The pair met at a "rainbow gathering" in Georgia, which Capstraw described as a "hippie commune festival" where "people get together and pray for world peace." After the gathering was over, they made plans to hitchhike to every state in the country together. Capstraw began hitchhiking two years prior when he aged out of foster care at the age of eighteen.

On July 7, 2018, Amber and Capstraw were hitchhiking on a highway near Louisville, Kentucky. A stranger named Jacob Barnes (Jacob), accompanied by his friend Levi, offered the pair a ride, which they accepted. When Jacob realized that Amber and Capstraw did not have a place to sleep that night, he offered to let the pair stay with him at his home in Hardin County; they agreed. The group then stopped at a gas station near Jacob's home and picked up another individual named Amber Noe (Noe).

It was undisputed that when the group arrived at Jacob's home "the atmosphere was fine." Jacob said that Amber and Capstraw were "singing and playing a ukulele" and "everyone was having fun." Shortly thereafter, Jacob, Levi, and Noe went to Louisville so Noe could buy heroin, leaving Amber and Capstraw at the home by themselves for approximately two hours. Capstraw claimed that, during that time, he and Amber drank almost an entire fifth of bourbon between them. He further claimed that he and Amber were having a

"really good conversation" when Amber began disparaging Jacob; she was upset that he was taking Noe to get drugs. An argument ensued. As discussed below, Capstraw gave differing accounts of what occurred next, but consistently maintained that he "blacked out," and when he came to, Amber was dead on the living room floor.

Capstraw then left Jacob's home and went to two other homes in the neighborhood in an apparent attempt to get help, but he got no response. The third home he went to was occupied by Steven Ginn (Steven). Steven testified that he was in bed asleep when someone began banging on his front door between midnight and 1 a.m. He went to the door and saw Capstraw standing on his porch covered in blood. Steven told Capstraw to stay where he was while Steven went to get his oldest son out of bed. When Steven and his son came back, Capstraw "kept blurting out that he had done something," and asked them to follow him. Steven and his son obliged. Steven said that as they were walking back to Jacob's house with Capstraw, he kept saying that he had done something bad and then said, "I killed her."

Sargent Brandon Huggins (Sgt. Huggins) and Officer Charles Foushee (Ofc. Foushee) were dispatched to the neighborhood that night in response to calls about a man fitting Capstraw's description banging on the doors of several homes. Sgt. Huggins testified that Steven flagged him down and directed him to Jacob's address. When Sgt. Huggins arrived at Jacob's home, Capstraw was on the ground in the front yard screaming "save her, save her, save her." Ofc.

3

Foushee said that Capstraw was "very erratic": he was sweating profusely, screaming, and "moving around a lot." The officers detained Capstraw and questioned him about what had occurred. Capstraw told them that Amber had attacked him with a knife, he blacked out, and when he came to, she was dead. Sgt. Huggins testified that Capstraw smelled "a little bit like alcohol," but Ofc. Fouchee did not detect the smell of alcohol, nor did he observe any other signs of intoxication apart from Capstraw's erratic behavior. The officers observed several superficial cuts on Capstraw's inner left forearm, which was bandaged by emergency medical services at the scene. The officers did not observe, and Capstraw did not report, any other injuries.

Capstraw was then transported from the crime scene to the police station to be interviewed by then-Detective Madison Kuklinski (Det. Kuklinski). Det. Kuklinski testified that, during the interview, Capstraw did not admit to anything, but made statements such as "I know what I did," and "I guess I killed her." He told her that he and Amber got into an argument because "she started judging Jacob." Capstraw claimed that he tried to calm Amber down, but she went into the kitchen and got a knife and attacked him with it, causing the cuts on his left arm. He was adamant that he did not cut himself. During the interview, Capstraw began complaining about having a lot of pain in his hands. Det. Kuklinski said that she transported Capstraw to the hospital after the interview to have his hands and left arm treated.

At trial, Capstraw's version of what occurred changed. He testified that he and Amber got into an argument and Amber struck him in the face; he then

4

blacked out, and Amber was dead when he came to. Capstraw said he then got a knife from the kitchen and tried to kill himself by cutting his arm because he thought Amber was dead. He alleged that, as he was cutting himself, he heard Amber breathing. He claimed that was the point at which he ran out of the house and began banging on doors in the neighborhood.

Dr. Jefferey Springer (Dr. Springer) was the forensic pathologist that conducted Amber's autopsy. He opined that her causes of death were blunt force trauma and strangulation. He further testified that Amber was a petite 5'3", and weighed only 92 pounds, whereas Cox was 6'3" and weighed 188 pounds. Her toxicology screen determined that her blood alcohol level was .093% approximately two hours before her death.

The jury was instructed on murder, second-degree manslaughter, and the defense of intoxication. It found Capstraw guilty of murder and sentenced him to fifty years.

Additional facts are discussed below as necessary.

## II.  ANALYSIS

### A. The trial court did not abuse its discretion by failing to exclude eight gruesome photographs.

Capstraw's first assignment of error on appeal is that the trial court erred by allowing the admission of eight gruesome photographs: four from Amber's autopsy and four from the crime scene. Capstraw's argument was preserved by his pre-trial motion *in limine* to exclude the photographs on the grounds that they did not satisfy a KRE 403 balancing test, and, therefore,

5

should not be admitted in accordance with this Court's holding in *Hall v. Commonwealth*.[4] We therefore review the trial court's ruling for an abuse of discretion.[5] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[6]

For context, we will first provide descriptions of the photographs, as well as their accompanying testimony at trial.

Exhibits 4-7 are autopsy photos that were introduced during Dr. Springer's testimony. We note here that each of the autopsy photos were taken after Amber's blood was removed from her body.

Exhibit 4 depicts Amber's face and neck from a straight-on angle. Dr. Springer testified that the photograph shows the multiple blunt force traumas she sustained to her face and skull, including several lacerations, abrasions, and contusions. Specifically, he discussed the approximately 1 inch long, deep, vertical cut between her eyebrows beneath which the frontal bone of her skull was fractured. He further noted that both of her eyes were black, and there were smaller cuts below both eyes. The picture also shows that her nose was broken and displaced. And, finally, Amber's mouth is only slightly open in the photograph, but one can see something in her mouth on the left side. Dr.

---

[4] 468 S.W.3d 814 (Ky. 2015).

[5] *See, e.g., Meece v. Commonwealth*, 348 S.W.3d 627, 645 (Ky. 2011).

[6] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Springer explained that, while most of her teeth were intact, her maxilla—the bone holding her upper row of teeth in place—was fractured and had fallen down into her mouth.

Exhibit 5 is a photo of the left side of Amber's neck. Dr. Springer testified that she also had bruising to the right side of her neck, though it is not depicted in the photo. The photo demonstrates a lack of ligature marks, which led Dr. Springer to determine that manual strangulation was used. This contributed to his conclusion that strangulation was one of the causes of death.

Exhibit 6 shows a close-up of Amber's mouth. Dr. Springer discussed how the photo shows contusions and lacerations sustained around her mouth, as well as a tooth that was displaced due to her broken maxilla.

Exhibit 7 is a photo of the back-left side of Amber's head. Her left ear is pulled away from her head, and there are bruises on the back of her ear and the skin on her skull behind it. Dr. Springer said that the back of the ear is a difficult place to injure unless it has been directly struck by something. He opined that the bruising was also due to blunt force.

Exhibits 28-31 were pictures from the crime scene that were introduced during Det. Kuklinski's testimony.

Exhibit 28 depicted how Amber's body was found. It shows her laying on her back on the floor of the living room in front of the couch with a large pool of blood beneath and around her. Det. Kuklinski discussed how the photo depicts blood and tissue spatter around her on both the floor and the couch

7

itself.  It also shows a red, foamy substance coming out of her mouth, which indicated that she aspirated on her blood.  The photo is taken from such a distance that the extensive damage to her face cannot be discerned, though it is clearly covered in blood.

Exhibit 29 is a close-up of the bruising on the right side of Amber's neck. Det. Kuklinski testified that the fact that bruising was already present when the police arrived at the scene indicated that a tremendous amount of force was used to strangle her, as bruises usually take some time to develop.

Exhibit 30 is a cropped picture that shows Amber's left arm.  A large blue bruise can be seen on the inner part of her arm just above her elbow crease. Det. Kuklinski said that this kind of bruise is often seen in domestic violence situations: the suspect will grab the victim by the arm and cause bruising in that area.  And, again, the fact that the bruise had already appeared demonstrated the amount of force with which it was inflicted.

Finally, Exhibit 31 is a close up of an entire tooth that was found next to Amber's body.  Det. Kuklinski testified that the fact that a whole tooth was knocked out demonstrated the amount of force her mouth sustained.

During a pre-trial hearing on Capstraw's motion *in limine,* the trial court went through each of the foregoing eight photographs, as well as an additional autopsy photo that depicted how the retina in one of Amber's eyes had "exploded."  The trial court had the Commonwealth explain the probative value of each of the photographs individually.  The trial court then went through

8

each photo and discussed the reasons that each was admissible or inadmissible.

The court found that Exhibit 4 was not particularly gruesome in that it was an autopsy photo, and it was necessary in order for the Commonwealth to show the level, nature, and number of injuries. It likewise found that Exhibit 5 was not problematic because it only shows the strangulation marks on Amber's neck. It found that Exhibit 6 was, again, not very gruesome and was needed to show the level of disruption to Amber's facial structures that was not as apparent in Exhibit 4. It also found Exhibit 7 to not be gruesome because it only showed her ear and bruising. While it acknowledged that Exhibit 28 was "perhaps the most troubling and gruesome of all," it nevertheless found that "it is what it is: it [showed] where the body was, it [showed] . . . the condition of the body," and it therefore had to be admitted. The court had the Commonwealth crop Amber's head and additional blood from Exhibit 29 so that it showed only the bruising on her neck. It similarly had the Commonwealth crop Exhibit 30 to remove a pool of blood and show only her arm. And, finally, the court had the Commonwealth use a photograph that excluded additional blood and showed only the tooth that had been knocked out for Exhibit 31.

The court completely excluded the autopsy photograph depicting her eye because it "was so shockingly a problem." It directed the Commonwealth to have Dr. Springer explain the injury without using the photograph.

9

Before this Court, Capstraw contends that the probative value of many of the photos was quite low. He further asserts that Dr. Springer and Det. Kuklinski could have adequately described Amber's injuries in a way that sufficiently proved those facts without the high risk of prejudice engendered by the admission of the gruesome photos. Therefore, he argues, the trial court abused its discretion by admitting them. We disagree.

One of the most basic principles regarding the admission of evidence is the balancing test required under KRE 403, which directs that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice[.]" Concerning gruesome photographs in particular, it is well-established that

> [b]ecause the Commonwealth must prove the *corpus delicti*, photographs that are probative of the nature of the injuries inflicted are not excluded unless they are so inflammatory that their probative value is substantially outweighed by their prejudicial effect. KRE 403. Thus, a photograph of the crime scene does not become inadmissible simply because it is gruesome and the crime is heinous.[7]

This principle was reinforced by this Court in *Hall v. Commonwealth*.[8] In *Hall*, the trial court allowed the Commonwealth to introduce twenty-eight crime scene and autopsy photos over the defendant's objection.[9] Several of the photos were needlessly cumulative in that they showed different angles of the same gruesome injuries, and, therefore, "the probative value of many of the

---

[7] *Adkins v. Commonwealth*, 96 S.W.3d 779, 794 (Ky. 2003) (internal citations and quotation marks omitted).

[8] 468 S.W.3d 814 (Ky. 2015).

[9] *Id.* at 820.

gruesome photos was quite low."[10]  This Court was particularly troubled by the fact that the trial court determined the admissibility of the photographs "all at once, with no emphasis on their relative or incremental probative value."[11]

Consequently, in *Hall*, we emphasized that trial courts must conduct a KRE 403 balancing test on each gruesome photo individually before allowing its admission:

> There are three basic inquiries that the trial court must undertake when determining admissibility of relevant evidence under Rule 403.  First, the trial court must assess the probative worth of the proffered evidence; second, it must assess the risk of harmful consequences (i.e., undue prejudice) of the evidence if admitted; and last, it must evaluate whether the probative value is substantially outweighed by the harmful consequences.[12]

Further, "the judge must consider the photographs within the full evidentiary context of the case, giving due regard to other evidence admitted as well as evidentiary alternatives[.]"[13]  However, "the evidence must be highly inflammatory and prejudicial to compel a party to employ evidentiary alternatives."[14]

In this case, the trial court did precisely what we asked of it in *Hall*: it considered each photograph individually and assessed its probative value against the risk of undue prejudice to the defendant carefully.  It also had the Commonwealth crop certain crime scene photographs so that they showed

---

[10] *Id.* at 825.

[11] *Id.* at 827.

[12] *Id.* at 823.

[13] *Id.* at 824.

[14] *Id.*

precisely what the Commonwealth was trying to demonstrate and excluded extraneous gruesome details. And, it directed the Commonwealth to employ an evidentiary alternative for a particularly disturbing autopsy photo of Amber's eye.

Further, we agree with the trial court's determination that the probative value of the admitted photos was not substantially outweighed by a risk of undue prejudice to Capstraw. The only issue the jury had to decide in this case was whether Capstraw acted intentionally or wantonly. "Proof of intent . . . may be inferred from the character and extent of the victim's injuries."[15] Therefore, the probative value of the photos that demonstrated Amber's numerous injuries and the corresponding amount of force required to inflict them—Exhibits 4, 6, 7, 29, 30, and 31—was quite high. And, as the trial court noted, none of those photos were gruesome enough to warrant the use of evidentiary alternatives. The remaining two photographs, Exhibits 5 and 28 also had high probative values. Exhibit 5 demonstrated that one of Amber's causes of death was manual strangulation, which further suggested that Capstraw acted with intent. Exhibit 28, which is by far the most gruesome photograph in the group, depicted how Amber was discovered by police at the crime scene. This photograph accordingly had a very high probative value as it was essential to the Commonwealth in proving the *corpus delicti*.

---

[15] *Ratliff v. Commonwealth*, 194 S.W.3d 258, 275 (Ky. 2006).

Based on the foregoing, we hold that the trial court did not abuse its discretion.

**B. Capstraw's right to a unanimous jury verdict was not violated.**

Capstraw next alleges that the jury instruction for murder violated his right to a unanimous verdict. Those instructions directed:

> You will find the Defendant guilty of Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
>> A. That in this county on or about the evening hours of July 6, or the early morning hours of July 7, 2018, and before the finding of the Indictment herein, he killed Amber Robinson by inflicting blunt force trauma, or strangulation, or both; **AND**
>>
>> B. That in so doing:
>>
>>> (1) He caused the death of Amber Robinson intentionally; **OR**
>>>
>>> (2) He was wantonly engaging in conduct which created a grave risk of death to another and thereby caused the death of amber Robinson under circumstances manifesting an extreme indifference to human life.

Capstraw argues that these instructions violated his right to a unanimous verdict because the jury was instructed on two different *mens rea* requirements: intentional and wanton. Accordingly, he argues, some of the jurors could have believed he acted intentionally, while others could have believed he acted wantonly, thereby violating his right to a unanimous verdict.

However, Capstraw did not properly preserve this argument for our review. While we acknowledge that Capstraw proffered his own jury

13

instructions that objected to the giving of any jury instructions, that blanket

objection is insufficient:

> No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.[16]

And, upon careful inspection of the record, Capstraw did not object to the jury

instruction that was ultimately submitted to the jury.  While discussing the

jury instructions with the trial court, the following exchange regarding the

murder instruction occurred:

> **Defense**: We possibly have one concern that we're still fleshing out.  It's that, the way the jury form is set up, it seems that, we're concerned about a possible inconsistent verdict where there's a split between intentional or wanton murder and there's no way to—
> **Court**: That's not—
> **Commonwealth**: That's not an issue.
> **Defense**: Fair enough.
> **Court**: I see that, but the case law is that if six of the jurors believe it was intentional and six of them think it was wanton with extreme indifference, since it is the same offense, murder, same classification, same penalty, they're not required to be unanimous as long as each of them believe one of those two things.  I think that is the law in Kentucky.

The defense did not pursue the issue further.  We therefore hold that this issue

is unpreserved.

Nevertheless, Capstraw's assignment of error implicates his

constitutional right to a unanimous verdict.[17]  "[A]lleged constitutional errors, if

---

[16] Kentucky Rule of Criminal Procedure (RCr) 9.54(2).

[17] Ky. Const. § 7.

14

unpreserved, are subject to palpable error review."[18]  We will accordingly review for palpable error.[19]

Capstraw asserts that we must overturn our well-established precedent that a "'combination' [murder] instruction, [that] permits a guilty verdict even though some of the jurors believed the killing intentional and others wanton . . . does not deprive the defendant of a unanimous verdict, as required by this State's Constitution, provided that the evidence reasonably supports both theories of the crime."[20]  His basis for this argument is the United States Supreme Court's recent holding in *Ramos v. Louisiana*.[21]

In *Ramos*, the United States Supreme Court simply held that the United States Constitution's Sixth Amendment right to a unanimous verdict in criminal trials applies to all states through the Fourteenth Amendment.[22]  This holding truly only affected the two states that remained holdouts on that issue: Oregon and Louisiana.[23]  In contrast, Kentucky has long required criminal convictions by a unanimous jury verdict.  Over four decades ago, in *Wells v. Commonwealth*, this Court held that "Section 7 of the Kentucky Constitution requires a unanimous verdict reached by a jury of twelve persons in all

---

[18] *Walker v. Commonwealth*, 349 S.W.3d 307, 313 (Ky. 2011).

[19] *See* RCr 10.26.

[20] *Malone v. Commonwealth*, 364 S.W.3d 121, 130 (Ky. 2012) (citing *Robinson v. Commonwealth*, 325 S.W.3d 368 (Ky. 2010)).

[21] __ U.S. __, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020).

[22] *Ramos*, 140 S. Ct. at 1397.

[23] *Id.* at 1394.

15

criminal cases."[24] And, several cases that were rendered post-*Wells* made it clear that jury instructions such as the one given in this case do not violate a defendant's right to a unanimous verdict as long as the evidence was sufficient to support a combination instruction.[25] We are accordingly unconvinced that *Ramos* requires us to revisit our long-standing precedent, and hold that Capstraw's right to a unanimous verdict was not violated.

**C. Capstraw's Confrontation Clause rights were not violated.**

Capstraw's third assignment of error is that his Sixth Amendment Confrontation Clause rights were violated when Det. Kuklinski was permitted to testify about blood alcohol test results from Capstraw's certified medical records. Capstraw acknowledges that he failed to preserve this error at the trial court level, but requests that this Court review for palpable error.[26] "The required showing for relief from a palpable error is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law."[27]

Det. Kuklinski testified that during her interview with Capstraw, he began complaining about pain in his hands. Det. Kuklinski also had to remove

---

[24] 561 S.W.2d 85, 87 (Ky. 1978). *See also,* Kentucky Revised Statute (KRS) 29A.280(3) ("A unanimous verdict is required in all criminal trials by jury"); RCr 9.82(1) ("The verdict shall be unanimous. It shall be returned by the jury in open court.").

[25] *See, e.g., Commonwealth v. Hasch,* 421 S.W.3d 349, 365 (Ky. 2013); *Malone,* 364 S.W.3d at 130; *Travis v. Commonwealth,* 327 S.W.3d 456, 459 (Ky. 2010); *Benjamin v. Commonwealth,* 266 S.W.3d 775, 785 (Ky. 2008).

[26] *See* RCr 10.26.

[27] *See, e.g., King v. Commonwealth,* 554 S.W.3d 343, 375 (Ky. 2018).

the bandages from his left arm in order to photograph the numerous cuts he had. Det. Kuklinski therefore transported Capstraw to the hospital for treatment after the interview was complete. The certification on the medical records from that admission stated:

> Hardin Memorial Hospital certification regarding patient Joseph Capstraw . . . The copies of records for which this certification is made are true and complete reproductions of the original records housed in Hardin Memorial Hospital. The original records are made in the regular course of business, and it was the regular course of Hardin Memorial Hospital to make such records at or near the time of the matter recorded. This certification is given pursuant of KRS 422.300-.330 by the custodian for the records in lieu of personal appearance.

After the Commonwealth had Det. Kuklinski read the records' certification, the following exchange occurred:

> **Q:** Do you see a test for blood alcohol?
> **A:** Yes sir.
> **Q:** Does it give you an ethanol reading?
> **A:** It does.
> **Q:** And what is the reading?
> **A:** Less than ten.
> **Q:** And does it give you a way to interpret what does less than ten mean?
> **A:** There is a key and it says, "less than ten essentially negative."

In addition, the emergency room physician's clinical report stated: "Patient brought into the ED by EPD for medical clearance for an arm laceration." And, the radiology report noted that Capstraw had "right hand pain in the fifth digit." The medical records were not entered into evidence.

During Det. Kuklinski's cross-examination, the defense elicited that Capstraw's blood samples were taken by the hospital approximately ten hours after the crime occurred.

17

Capstraw contends that, because he was in police custody when the hospital tested his blood, the results should be considered "testimonial in nature." Consequently, he argues that allowing Det. Kuklinski to testify about the results instead of the hospital employee that tested his blood violated his Confrontation Clause rights under the United States Supreme Court's ruling in *Crawford v. Washington*.[28] We disagree and hold that this Court's ruling in *Little v. Commonwealth*[29] is dispositive.

In *Crawford*, the United States Supreme Court held "that the Sixth Amendment prohibits the admission of the testimonial statement of a declarant who does not appear at trial, unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination."[30] The *Crawford* Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'"[31] However, it noted that one class of statement that qualified as "testimonial" was a statement "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[32] In addition, "[t]he Supreme Court's post-*Crawford* decisions in *Melendez–Diaz v. Massachusetts*[33] and *Bullcoming v. New Mexico*[34]

---

[28] 541 U.S. 36 (2004).

[29] 422 S.W.3d 238 (Ky. 2013).

[30] *Peters v. Commonwealth*, 345 S.W.3d 838, 842 (Ky. 2011).

[31] *Crawford*, 541 U.S. at 68.

[32] *Id.* at 52.

[33] 557 U.S. 305 (2009).

[34] 564 U.S. 647 (2011).

18

distinguished between testimonial medical records and records intended for medical treatment."[35]  This distinction was put on full display in this Court's ruling in *Little.*

In *Little,* the defendant Shelby Little (Little) was convicted of several crimes in relation to a motor vehicle accident he caused while under the influence of alcohol.[36]  Little was injured during the accident, and was transported from the crime scene to the hospital.[37]  On appeal to this Court, Little argued that a report created by the hospital when he arrived for treatment was presented at his trial in violation of his Confrontation Clause rights because "it was introduced without the testimony of the person who prepared it."[38]  The report, which was created by the hospital, was "a comprehensive blood analysis report that [contained], among other things, information regarding Little's blood alcohol level shortly after his hospital admission."[39]

The *Little* Court held that Little's Confrontation Clause rights were not violated because the report was not testimonial in nature.  It reasoned:

> In *Melendez–Diaz,* the Supreme Court analyzed the admissibility of affidavits reporting the results of a forensic drug test.  The Court
>
> found forensic reports prepared for trial to be "testimonial" but "medical reports created for treatment purposes" to "not be testimonial under our decision today."  Justice Sotomayor's

---

[35] *Little,* 422 S.W.3d at 246.

[36] *Id.* at 240.

[37] *Id.* at 245.

[38] *Id.*

[39] *Id.*

concurring opinion in *Bullcoming v. New Mexico* expanded upon the importance of this delineation: When the primary purpose of a statement is not to create a record for trial, the admissibility of the statement is the concern of state and federal rules of evidence, not the Confrontation Clause. The concurrence further explained that, to determine if a statement is testimonial, we must decide whether it has a primary purpose of creating an out-of-court substitute for trial testimony.[40]

This Court noted that the record established that "Little was treated at University Hospital for injuries he received in the collision, including emergency surgery for a fractured femur."[41] And, consequently, the "comprehensive blood analysis report was clearly intended for the primary purpose of providing that medical treatment to Little, and was not intended to establish or prove a fact or serve as a substitute for trial testimony."[42] The admission of the report was therefore governed by KRE and not the Confrontation Clause.[43]

In that vein, the *Little* Court further held that the hospital's report was a business record pursuant to KRE 806(3) that was properly certified under KRS 422.305:

> Business records of regularly conducted activities, such as medical records, are subject to an exception to the hearsay rule under KRE 803(6). A medical record must first pass the authentication requirements before it can be admitted under the hearsay exception. Typically, the testimony of "the custodian or other qualified witness" is a foundational requirement for the admission of a medical record under the business records exception. KRE

---

[40] *Id.* at 246 (internal citations and quotation marks omitted).

[41] *Id.*

[42] *Id.* (internal quotation marks omitted).

[43] *Id.*

803(6)(A). However, a medical record will qualify as self-authenticating when it consists of medical charts or records of a hospital that has elected to proceed under the provisions of KRS 422.300 to 422.330[.] KRE 803(6)(A).

[. . .]

[T]he hospital laboratory report was properly admitted as a business record pursuant to KRE 803(6). The testimony of the person who prepared the report was not required because the report was not testimonial and Little's confrontation rights were not violated by its admission. The report was a business record properly certified under KRS 422.305(2), and the trial court did not err in admitting it.[44]

In Capstraw's case, the record is clear that he was taken to the hospital to receive treatment for his hands and left arm. It is likewise clear that the complained-of blood alcohol test was administered as part of his treatment. Therefore, as in *Little*, the corresponding medical report was made for the purposes of medical treatment and is not "testimonial in nature." Its admissibility was therefore not governed by the Confrontation Clause. Further, the medical records' certification stated that it was created "in the regular course of business" and that the certification was "given pursuant of KRS 422.300-.330 by the custodian for the records in lieu of personal appearance." The medical record was accordingly a business record pursuant to the hearsay exception of KRE 806(3) that was properly certified under KRS 422.305(2). No error, palpable or otherwise, occurred.

---

[44] *Id.* 246-47 (internal citations and quotation marks omitted).

**D. The trial court erred by imposing jail fees against Capstraw.**

Capstraw's final argument is that the trial court erred by imposing jail fees against him as part of his sentencing. He acknowledges that this error was not properly preserved. "Nonetheless, since sentencing is jurisdictional it cannot be waived by failure to object. Thus, sentencing issues may be raised for the first time on appeal[.]"[45] Capstraw requests review for palpable error.

Capstraw's sentencing order states: "Defendant is ordered pursuant to KRS 411.265 and KRS 532.356 to reimburse costs & fees of incarceration in the amount of record with the Hardin County Jailer as of the date of sentencing. The costs & fees shall be reimbursed to the Hardin County Jailer." Capstraw argues that this was error because there was no evidence of record that the Hardin County jail had adopted a jail fee reimbursement policy. The Commonwealth agrees with his argument, as does this Court.

This issue has been addressed in several unpublished cases from this Court and the Court of Appeals. In *Weatherly v. Commonwealth,* we vacated jail fees imposed against the defendant because "there [was] no evidence that Fulton County had established a jail fee reimbursement policy pursuant to statute, and no evidence that such policy was ever presented to the trial court to be considered in sentencing."[46] The Court of Appeals followed suit in three

---

[45] *Travis v. Commonwealth,* 327 S.W.3d 456, 459 (Ky. 2010) (internal citations and quotation marks omitted).

[46] 2017-SC-000522-MR, 2018 WL 4628570, at *10 (Ky. Sept. 27, 2018). *See also, Melton v. Commonwealth,* 2016-SC-000552-MR, 2018 WL 898307, at *12 (Ky. Feb. 15, 2018).

22

subsequent unpublished cases: *Campbell v. Commonwealth*,[47] *Jackson v. Commonwealth*,[48] and *Bishop v. Commonwealth*[49]. In each of those cases, the Court of Appeals vacated the imposition of jail fees due to a lack of evidence that a jail fee reimbursement policy had been adopted by the jailer with the approval of the county's governing body.

With our published opinion today, we reiterate our holding in *Weatherly* and emphasize that in order to impose jail fees against a criminal defendant during sentencing, there must be some evidence presented that a jail fee reimbursement policy has been adopted by the county jailer with approval of the county's governing body in accordance with KRS 441.265(2)(a).[50]

Consequently, because there was no such evidence presented during Capstraw's sentencing, the jail fees imposed against him must be vacated.

---

[47] 2020-CA-0690-MR, 2021 WL 1051590 (Ky. App. Mar. 19, 2021).

[48] 2018-CA-000543-MR, 2019 WL 2246172 (Ky. App. May 24, 2019).

[49] 2017-CA-001793-MR, 2019 WL 103924 (Ky. App. Jan. 4, 2019).

[50] "The jailer may adopt, with the approval of the county's governing body, a prisoner fee and expense reimbursement policy, which may include, but not be limited to, the following:

1. An administrative processing or booking fee;

2. A per diem for room and board of not more than fifty dollars ($50) per day or the actual per diem cost, whichever is less, for the entire period of time the prisoner is confined to the jail;

3. Actual charges for medical and dental treatment; and

4. Reimbursement for county property damaged or any injury caused by the prisoner while confined to the jail." KRS 441.265(2)(a).

## E. CONCLUSION

Based on the foregoing, Capstraw's sentence is affirmed, but the portion of the judgment whereby jail fees are imposed against him is hereby vacated.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Aaron Reed Baker
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Mark Daniel Barry
Assistant Attorney General